[Crim. No. 8754. In Bank. June 27, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CARL ALFRED
QUICKE, Defendant and Appellant.

George H. Chula and John Alan Montag for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—This is an automatic appeal, under section 1239, subdivision (b), of the Penal Code, from a judgment imposing the death penalty upon defendant for the first degree murder of Susan Nash. On defendant's first appeal we affirmed the judgment of guilt but reversed the judgment as to penalty. (*People* v. *Quicke* (1964) 61 Cal.2d 155 [37 Cal. Rptr. 617, 390 P.2d 393].) At the second penalty trial the jury again fixed the penalty at death; this appeal followed.

We shall explain why the judgment in the second penalty trial must be reversed because the trial court committed error of the type condemned in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], in excusing prospective jurors for cause. We shall also explain that although we have concluded that defendant may properly raise in this appeal from his second penalty trial the contention that the introduction of his confessions at the guilt trial violated the rule of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], we cannot predicate a reversal upon such evidence. Since defendant spontaneously gave his first confession at the investigatory stage it was properly admitted, and the subsequent ones, although erroneously introduced, did not cause prejudicial error.

Finally, for purposes of retrial we set forth certain errors incurred at the second penalty trial which should be avoided:

the admission of (1) the testimony of the court-appointed psychiatrist, (2) a transcript of defendant's testimony at the first penalty trial, and (3) a transcript of a girl's testimony at the guilt trial that two weeks before the killing defendant had forced her to engage in sexual intercourse with him.

### 1. The improper excusal of prospective jurors at the penalty trial.

██ At the outset we observe that the trial court at the second penalty trial undoubtedly excused four prospective jurors in violation of *Witherspoon*. None of these jurors made it "unmistakably clear· (1) that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him], or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's *guilt.*" (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522-523, fn. 21 [20 L.Ed.2d at p. 785].)[1] ██ As *Witherspoon* explains, "a sentence of death

---

[1]We set forth the *voir dire* examinations of the jurors so excluded. The court had asked the 12 veniremen initially seated in the jury box, "Ladies and gentlemen, the District Attorney . . . is asking for the death· penalty in this case. Are there any of you that hold a conscientious objection against the death penalty? If you do, raise your hand. In a proper case, of course."

*Mr. Chailland*

"THE COURT: Did you hear the questions I asked the other jurors, Mr. Chailland?

"MR. CHAILLAND: Yes, sir.

"THE COURT: Would your answers be about the same?

"MR. CHAILLAND: No, Your Honor. I am not in favor of capital punishment. ·

"THE COURT: You have a conscientious objection to it?

"MR. CHAILLAND: Yes, I do.

"THE COURT: You may be excused."

*Mrs. Grace*

"THE COURT: Mrs. Grace, you heard the ·questions I asked the other jurors?

"MRS. GRACE: Yes, Your Honor.

"THE COURT: Would your answers be any different?

"MRS. GRACE: No, Your Honor, I do not believe in capital punishment.

"THE COURT: You are excused."

*Mr. Brito*

"THE COURT: Mr. Brito, you heard the questions I asked the other jurors?

"MR. BRITO: No, sir. I am against capital punishment.

"THE COURT: All right, you may be excused."

*Mrs. Rittierodt*

"THE COURT: Mrs. Rittierodt, you heard the questions I asked the other jurors?

"MRS. RITTIERODT: Yes.

"THE COURT: Would your answers be substantially the same?

MRS. RITTIERODT: No, sir. I don't believe in capital punishment.

"THE COURT: You are excused."

can not be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'' (*Witherspoon* v. *Illinois, supra,* 391 U.S. at p. 522 [20 L.Ed.2d at pp. 784-785].) ██ ''[I]t cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see *People* v *Bandhauer,* 66 Cal.2d 524, 531, 426 P.2d 900, 905) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.'' (*Id.* at pp. 515-516, fn. 9 [20 L.Ed.2d at p. 781].) ██ As the record demonstrates, the exclusion of the veniremen requires reversal of the judgment as to penalty. (*In re Anderson* (1968) 69 Cal.2d 613, 619-620 [73 Cal.Rptr. 21, 447 P.2d 117].)

## 2. *The earlier proceedings.*

██ We must, further, examine the earlier proceedings leading to the determination of defendant's guilt in order to decide whether the trial court in admitting defendant's extrajudicial confessions at the guilt phase complied with the decision of the United States Supreme Court in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and the decision of this court in *People* v. *Dorado, supra,* 62 Cal.2d 338. These decisions hold that when the accusatory stage has begun the police must advise a suspect of his right to counsel and his right to remain silent.

The above principle applies to all cases which were not final on June 22, 1964, the date on which the United States Supreme Court rendered the *Escobedo* decision. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221] ; *In re Lopez* (1965) 62 Cal.2d 368 [42 Cal.Rptr. 188, 398 P.2d 380].) We have adopted, for the purpose of applying the *Escobedo* holding, the definition of finality found in *Linkletter* v. *Walker* (1965) 381 U.S. 618, 622, fn. 5 [14 L.Ed.2d 601, 604, 85 S.Ct. 1731] : ''By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed. . . .'' (*In re Spencer* (1965) 63 Cal.2d 400, 405 [46 Cal.Rptr. 753, 406 P.2d 33].)

██ We decided defendant's first appeal on March 20, 1964 (*People* v. *Quicke, supra,* 61 Cal.2d 155) ; we denied the state's petition for rehearing on April 15, 1964 (*id.* at p.

163). Since defendant could have petitioned the United States Supreme Court for certiorari within 90 days after our denial of the petition for rehearing (28 U.S.C. § 2101, subd. (d); rule 22, Rules of the United States Supreme Court; *Market Street Ry. Co.* v. *Railroad Com.* (1945) 324 U.S. 548, 552 [89 L.Ed. 1171, 1177, 65 S.Ct. 770]), the judgment was not final when *Escobedo* was decided. (*In re Shipp* (1967) 66 Cal.2d 721, 723-724 [59 Cal.Rptr. 97, 427 P.2d 761]; *People* v. *Treloar* (1966) 64 Cal.2d 141, 143 [49 Cal.Rptr. 100, 410 P.2d 620]; *People* v. *Arguello* (1965) 63 Cal.2d 566, 573 [47 Cal. Rptr. 485, 407 P.2d 661]; *People* v. *Polk* (1965) 63 Cal.2d 443, 447-448 [47 Cal.Rptr. 17, 406 P.2d 641]; *In re Spencer, supra,* 63 Cal.2d 400, 405.) Moreover, the judgment as to defendant's guilt is not yet final for *Escobedo-Dorado* purposes; we have reasoned that a capital defendant does not lose his right to seek certiorari on issues relating to the determination of his guilt until a determination of penalty becomes final within the meaning of our California appellate rules. (*In re Morse* (1969) 70 Cal.2d 702, 704 [76 Cal.Rptr. 385, 452 P.2d 601]; *People* v. *Ketchel* (1966) 63 Cal.2d 859, 863-866 [48 Cal.Rptr. 614, 409 P.2d 694].) Accordingly, we must decide whether defendant's confessions were erroneously admitted at his guilt trial.

We summarize the evidence introduced at the guilt trial: In the early hours of November 9, 1962, two police officers on patrol noticed an automobile parked on the side of a road. Shining a light into the car they observed defendant, an 18-year-old boy, with blood on his hands, lying on top of a girl's unclothed body. Officer Currie opened the door, leaned in, pointed his gun at defendant, and ordered defendant out of the car; defendant left the car, and the officers handcuffed him. Deputy Mahler asked, "Is she dead?" Defendant replied, "Yes, I guess so." Officer Currie examined the girl. The deputy observed blood around the girl's private parts, but could see no signs of life. He reported a possible murder over his car radio. The officers put defendant in the back seat of their patrol car and sat in the front seat.

The record shows that after defendant had been so placed in the back seat of the car the following discourse occurred between Officer Mahler and defendant:

"A Then I asked Quicke if he knew this girl up in the car was dead. He says, 'Yes, for the last two hours I have known it.' Then I asked him if he wanted to tell me what had hap-

pened, and he said yes. And then he started to tell me what had happened."

Thereupon defendant gave a full confession of the killing. The record likewise shows that upon the conclusion of this exchange the police investigators arrived and Mahler did not further converse with defendant.

The record likewise corroborates Mahler's testimony with that of the other officer who was working with him when they came upon the scene of the tragedy. Thus Officer Currie testified that Deputy Mahler and defendant engaged in the following conversation:

"Q Were his [defendant's] statements to you and Officer Mahler at this time—Deputy Mahler at this time, were they free and voluntary?

"A They were.

"Q What was the conversation that took place on this occasion?

"A Well, Deputy Mahler asked Mr. Quicke what had happened, and the series of questions I can't remember correctly because I was busy at the time with the radio, the other units arriving and giving them information.

"Q This was not you asking questions?

"A No. It was just what I heard Deputy Mahler—

"Q Ask?

"A Yes.

"Q That which you can recall will you relate?

"A Yes. Deputy Mahler asked Mr. Quicke to tell him what happened . . . ."

Deputy Mahler testified that defendant stated that he was in the course of taking the girl home after a movie and that when his car heated up he parked and attempted to kiss her. When she protested he put his hand over her mouth; she struggled, and he then began to choke her. After a while he removed his hands from her throat, put his belt around her neck, and drove the car about 6 miles to the place where the officers discovered him. He then undressed the victim, placed her in the back seat, removed his own clothes, and had sexual intercourse with her. During the conversation, Sergeant Griffeth entered the car and sat next to defendant in the back seat; he asked "a couple of questions." Officer Currie estimated that the interval between their arrival and the end of this conversation was 20 or 25 minutes.

After defendant gave his statement, further investigatory units arrived. Two other police officers took defendant to their

car and began questioning him about the events surrounding the death. During the course of that conversation they drove with defendant back to the place where he had choked the girl; they questioned him further at that spot and then took defendant to the sheriff's office. This tape-recorded interrogation, introduced in evidence, took place between 4:35 a.m. and 6:05 a.m., November 9, 1962.

At the sheriff's office the officers again interrogated defendant in a tape-recorded session lasting about 25 minutes. In response to questions, defendant added some details to his description of the actual sequence of events surrounding the strangulation. He stated that when the girl refused to kiss him he put his hand over her mouth; she began gasping for air and attempted to blow the horn. Getting free for a moment, she said, "What kind of girl do you think I am?" He replied, "I think you're a very nice girl." She said, "Well, you're sure not acting like it." He replaced his hand over her mouth and held it there for a while; she continued to gasp for air. He then forced her against the car door and began choking her. She went limp, and he let go of her throat, but when she took some deep breaths he resumed the pressure. Finally, when she appeared to be still, he took off his belt, looped it around her neck, and pulled it fairly tight.

At the guilt trial the prosecution introduced these three confessions in evidence. In addition, other evidence showed that defendant had left his home in Lompoc on November 8, 1962, and driven to Santiago Canyon in Orange County, where he once had lived. He spent a large part of that afternoon looking for girls he had once known; he told one witness he was "going to get a piece" before leaving. Mrs. Nash, Susan's mother, testified that defendant came to their house at about 7 p.m. and asked Susan to go to the movies; after asking her mother's permission Susan left with defendant. A girl testified that two weeks before the killing she had been on a date with defendant. He had told her to get into the back seat of the automobile and had placed his hand over her mouth, making it hard for her to breathe, until she submitted to sexual intercourse with him. Defendant took the stand and, repeating the substance of his confessions, testified about the killing.

The trial court instructed the jury that it could find defendant guilty of first degree murder upon the theory either that the killing was willful, premeditated, and deliberate, or

that it was committed in the perpetration of or attempt to perpetrate rape.

### 3. The first extrajudicial confession.

We first explain why the introduction into evidence at the guilt trial of defendant's first extrajudicial confession does not violate the mandate of *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338. Under those decisions, if the investigation of a crime has reached the accusatory stage the trial court cannot admit defendant's extrajudicial statements elicited by the authorities unless the record affirmatively shows that prior to making the statements defendant was advised of his right to counsel and his right to remain silent. (See *People* v. *Stewart* (1965) 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97], affd. *sub nom. Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

The accusatory stage has begun when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements . . . ." (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353.)

As to defendant's first confession, when the officers discovered the girl's body, suspicion focused upon defendant, who was lying on top of that body. Defendant, handcuffed, was clearly in custody. (See *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515].) In probing the third factor, whether the officers had carried out a process of interrogations that lent itself to eliciting incriminating statements, we "analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances." (*People* v. *Stewart, supra,* 62 Cal.2d 571, 579.)

Following the mandate of *Stewart* we note that the "time of the interrogation" was the moment of the discovery of the murder and coincident with the arrest of defendant. The "place" of the interrogation was the scene of the rape, not police headquarters or remote from the discovery of the murder and the immediate investigation of it. As to the "nature of the questions," the record discloses only the pre-

liminary question of the officer as to "what had happened." We do not find a long series of probing queries which were designed to elicit incriminating statements. The "length of the interrogation" was comparatively short; it consisted almost entirely of a narration of the defendant.

We conclude that this confession did not arise "from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth" (*People* v. *Cotter* (1965) 63 Cal.2d 386, 393 [46 Cal.Rptr. 622, 405 P.2d 862], vacated on another ground in *Cotter* v. *California* (1967) 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 1035]), but rather because "defendant volunteered immediately after his arrest to tell the police 'what happened,' and proceeded to do so without solicitation by the officer present." (*People* v. *Powell* (1967) 67 Cal.2d 32, 51 [59 Cal.Rptr. 817, 429 P.2d 137].)

The instant case is reminiscent of *People* v. *Morse* (1969) 70 Cal.2d 711 [76 Cal.Rptr. 391, 452 P.2d 607], in which the jailer came upon the body of defendant's victim in the cellblock, and asked defendant, "Joe did you do this?" When defendant nodded his head, the jailer immediately asked, "Why?" (P. 720.) We upheld the introduction of the statements into evidence, in the absence of the warnings, stating: "The answers were offered immediately—one gets the impression almost laconically—without any pressure from the questioner. We cannot detect in such an exchange any of the marks of an accusatory process. We are satisfied that no process of interrogation had been undertaken." (P. 724.) Indeed, in the instant case, as in *People* v. *Powell* (1967) 67 Cal.2d 32, 51 [59 Cal.Rptr. 817, 429 P.2d 137], the "defendant volunteered immediately after his arrest to tell the police 'what happened,' and proceeded to do so without solicitation by the officer present." (To the same effect: *People* v. *Alesi* (1967) 67 Cal.2d 856, 865 [64 Cal.Rptr. 104, 434 P.2d 360]; *People* v. *Charles* (1967) 66 Cal.2d 330, 342 [57 Cal.Rptr. 745, 425 P.2d 545]; *People* v. *Treloar* (1966) 64 Cal.2d 141, 146 [49 Cal.Rptr. 100, 410 P.2d 620].)

The present case must then be distinguished from such instances as occurred in *People* v. *Luker* (1965) 63 Cal.2d 464 [47 Cal.Rptr. 209, 407 P.2d 9], where the court stated, "Before Luker gave the above statements he stated that he did not wish to talk until he had contacted his attorney. Despite this request, the officers continued to question him." (P. 474.) Another such example of the improperly introduced statement, procured by the police despite defendant's initial

denial of the offense or refusal to talk, occurs in *People* v. *Charles, supra,* 66 Cal.2d 330, 340: "The record affords no account of the content of the 'short conversation' which over-came Boddie's initial reluctance to incriminate himself, and it furnishes only a partial and fragmentary account of the nature and extent of the questioning which immediately preceded Boddie's ultimate decision to confess." (Fn. omitted.) The analogous interrogation by the police in "the interrogation room" at the Long Beach Police Department, according to a preconceived prosecution formula, likewise contrasts with the instant situation (*People* v. *Stockman* (1965) 63 Cal.2d 494, 498 [47 Cal.Rptr. 365, 407 P.2d 277].)

In the case before us the police officer in the early morning hours came upon a parked car containing the body of a girl, with a sleeping young man lying on top of her. Upon arresting the man, the officer quite naturally asked what had happened. The defendant, practically without interruption, told his tragic, gruesome story. This saga of events does not constitute the planned prosecution interrogation which calls for the warnings prescribed in *People* v. *Dorado, supra,* 62 Cal.2d 338; the police are not required to stop a person who "wants to confess to a crime and tell him to be quiet until an attorney is obtained to represent him." (P. 354, fn. 8.)

4. *The second and third extrajudicial confessions.*

We find, however, that the officers elicited the second and third confessions after the accusatory stage had begun. Subsequent to the first confession, and upon arrival of the police investigatory units, "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements. . . ." (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353.) Obviously, the situation fulfilled the first two requirements. It likewise disclosed the fulfillment of the third requirement. The interrogation took place over a period between 4:35 and 6:05 in the morning. Defendant was in a stationary police car with two officers. Although the tape recording does not indicate that the officers were abusive to defendant, their questions were persistent and clearly designed to elicit the details of the crime. Finally, the third confession, given at the police station, occurred under similar conditions. We therefore hold that the accusatory stage had matured as to the second and third confessions.

Since the record does not indicate that, prior to the time this interrogation occurred, the police advised defendant of his right to counsel and his right to remain silent, or that he waived such rights, the trial court improperly admitted the second and third confessions. (*People* v. *Stewart, supra,* 62 Cal.2d 571, 581; *People* v. *Dorado, supra,* 62 Cal.2d 338, 353-354.)

▮ The erroneous introduction at trial of the second and third confessions did not, however, constitute reversible error. In the case of the admission of a single invalid confession, in the absence of a properly admitted one, we have held that the introduction into evidence of such single confession causes prejudice per se and therefore compels reversal. (E.g., *People* v. *Schader* (1965) 62 Cal.2d 716, 729-730 [44 Cal.Rptr. 193, 401 P.2d 665], and cases cited therein.) We have so decided because a confession constitutes such persuasive evidence of guilt that we cannot hold that it is nonprejudicial; defendant's own statement that he committed the crime works havoc to the claim of innocence. (*Ibid*; see *People* v. *Parham* (1963) 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001].) Thus we have said that we cannot treat the introduction of such an inadmissible confession as harmless error because "the confession operates as a kind of evidentiary bombshell which shatters the defense." (*People* v. *Schader, supra,* 62 Cal.2d 716, 731.)

This reasoning does not apply if the record contains a properly admitted confession that is as damaging as the one improperly admitted. The properly admitted confession must nullify any ancillary effect of the improperly admitted confession. The explosion of the properly admitted confession relegates to the improperly admitted confession only a cumulative. or even *de minimis,* impact upon the jury.

We have held that once the defendant at the investigatory stage spontaneously gives a confession setting forth the substance of the offense, the introduction into evidence of his later, more detailed confessions, procured at the accusatory stage, does not work prejudice against him. Thus, in *People* v. *Jacobson* (1965) 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], defendant spontaneously declared his guilt to police officers both at the scene of the crime and in the police car on the way to the station; we held such statements not "elicited" during a process of interrogation. The police procured further statements from defendant at the police station during the accusatory stage. As we pointed out in *Jacobson,*

" [t]he intent of the officers undoubtedly was to elicit further incriminating details and preserve his confessions for use at trial." (63 Cal.2d at p. 329.) Although our opinion held that the later confessions containing the details of the crime should not have been admitted into evidence, we concluded that they did not prejudice defendant in view of the proper admission of the earlier confessions of the offense. (63 Cal.2d at pp. 330-331.)

We followed *Jacobson* in *People* v. *Cotter, supra,* 63 Cal.2d 386. In that case defendant gave no less than seven statements of guilt. We pointed out "that the final statement, the seventh, although adding certain details, was essentially a composite of the first four statements, all of which were given by defendant" prior to the accusatory stage. (63 Cal.2d at p. 392.) We explained that the "various statements did not contradict each other in any substantial degree and none of the details added by the seventh could have had any material effect on the outcome of the trial." (*Ibid.*) Consequently, we held that the erroneous admission of the statements obtained at the accusatory stage did not cause prejudice to defendant in view of the properly admitted earlier ones which described the crime. (63 Cal.2d at p. 398.)

In this case the properly introduced confession established the elements of the crime; the later repetitions of the confession did no more than fill in some details. Thus the first, second, and third confessions conformed with each other on the five following points: (1) defendant's attempting to kiss the victim; (2) defendant's placing his hand over the victim's mouth when she protested; (3) defendant's removal after a while of his hands from the victim's throat and his placing the belt around her neck; (4) defendant's driving of the car to the ultimate place of discovery; (5) defendant's undressing the victim and himself and engaging in sexual intercourse with her. The improperly introduced confession did no more than afford details of the victim's struggle after defendant began to choke her. These further statements disclose that the victim attempted to blow the horn, that the victim asked defendant what kind of a girl he thought she was, and that at a point he disengaged his grasp upon her throat. Although the elaboration of the struggle throws further light upon it, we cannot say that such elucidation does more than furnish details to a crime that, either on the ground of felony murder or on the ground of premeditation, clearly constituted first degree murder.

 We have further determined that the admission of the improperly obtained second and third extrajudicial confessions did not *induce* the testimonial confession. Exclusive of the second and third confessions, defendant was confronted with his own first, and admissible, confession, which established his guilt. We may properly conclude that there is no reasonable possibility that defendant would have elected not to take the stand and confess if he had been confronted with only the first extrajudicial confession and not the second and third ones. Since we have held that the first covered the substance of the second and third confessions, we cannot see how the introduction of, the latter could possibly have induced defendant to take the stand. (See *People* v. *Spencer* (1967) 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715]; *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 91 [11 L.Ed.2d 171, 175-176, 84 S.Ct. 229]; *People* v. *Schader, supra,* 62 Cal.2d 716, 728-731.)

5. *The alleged errors of the second penalty trial.*

We turn now to the matter of avoidance at the forthcoming penalty trial of alleged errors that occurred at the second penalty trial. During that trial defendant objected to the admission of the following evidence: (1) a transcript of defendant's testimony given at the guilt trial, in which he admitted the killing, (2) the testimony of Dr. Hunter, a psychiatrist appointed by the court to examine defendant, (3) a transcript of defendant's testimony given at the first penalty trial in which he admitted to other criminal conduct, and (4) a transcript of testimony given at the guilt trial by the girl who testified that two weeks before the killing defendant had forced her to engage in sexual intercourse with him.

Defendant's first contention that his testimonial confession at the guilt trial should not have been admitted at the penalty trial fails for the reasons above stated. We have pointed out that the extrajudicial confessions did not induce the testimonial confession.

Turning to defendant's second point, we recognize that the unlimited use of the psychiatrist's testimony violated the rule announced in *In re Spencer, supra,* 63 Cal.2d 400. There we described the nature of the defendant's constitutional right to counsel in the instance of an examination of defendant by a court-appointed psychiatrist. We held that "the presence of counsel at the psychiatric examination is not constitutionally required so long as certain safeguards are afforded to defendant." (*Id.* at p. 412.) We summarized these safeguards in *People* v. *Anderson* (1965) 63 Cal.2d 351, 367 [46

Cal.Rptr. 763, 406 P.2d 43] : ". . . the court-appointed psychiatrists should not be permitted to repeat the defendant's statements at the guilt trial unless the defendant specifically placed his mental condition into issue. Moreover, the trial judge should instruct the jury that the psychiatrist's testimony at the guilt trial which disclosed defendant's statements should be considered only for the purpose of exposing the information upon which the psychiatrist based his opinion and not as evidence of the truth of the statements."

These safeguards are as essential at the penalty trial as at the guilt trial. (See *In re Spencer, supra,* 63 Cal.2d 400, 412.) A defendant might well give to a court-appointed psychiatrist detrimental statements as to his past history and habits which the jury would weigh in determining whether or not defendant were fit to live. ▉▉▉ In the instant case Dr. Hunter's report, which he read at the second penalty trial, related initially the sequence of the crime, an account which defendant had revealed to the police. It then summarized the facts that defendant had told about past criminal offenses. The psychiatrist testified: "As a juvenile he had more arrests than he can count or recall and they consisted primarily of burglaries and runaways. His offenses began when he was only age eight. He had been apprehended for stealing two cars and he spent fourteen months in an Industrial School in Montana for one of these offenses. He said that since age 15 he has been incarcerated for 25 out of 29 months. He cannot count the amount of times he has been incarcerated prior to this period." The report went on to list other personal facts which defendant had reported to the doctor: his disinterest in attending church, his frequent practice of masturbation, his enjoyment in playing cowboys and Indians with "kids," his urge to dance in jail.[2]

The trial court should have instructed the jury that defendant's revelations to Dr. Hunter were not to be considered as evidence of the truth of the matters asserted. (*In re Spencer, supra,* 63 Cal.2d 400, 412.)

▉▉▉ We turn now to a consideration of defendant's third contention that the prosecution should not have read into evi-

---

[2] After Dr. Hunter had testified, defendant, in the presentation of his own case at the second penalty trial, called two other psychiatrists, at least one of whom was a court-appointed psychiatrist, as witnesses. Although these psychiatrists related many of the same background facts and the court gave no limiting instruction, we cannot hold that defendant has waived the error. Defendant strongly objected to this testimony of Dr. Hunter; only after the court overruled the objection did defendant call the other medical experts.

dence at the second penalty trial defendant's testimony adduced at the first penalty trial. Defendant argues that he took the stand at the first penalty trial only because of the improperly admitted testimony of the psychiatrists and that his statement should have been excluded as the fruit of that poisonous tree.

At the insanity trial, immediately preceding the first penalty trial, the court called as witnesses three psychiatrists, all of whom were of the opinion that defendant was sane. They also testified to statements that defendant gave them during the psychiatric examination; these statements included revelations of defendant's past crimes and arrests which coincided with those recounted at the second penalty trial. Since the trial court did not instruct the jury that these statements could not be considered as evidence of the truth of the matters asserted therein, they were placed before the jury in violation of the rule in *In re Spencer, supra,* 63 Cal.2d 400.

The parties stipulated at the first penalty trial that the jury could consider, in reaching its decision, all the evidence it had previously heard at the guilt and insanity phases of the trial. The prosecution presented to the jury no additional evidence of defendant's past criminal record.

At that first penalty trial defendant took the stand in his own behalf, directing his testimony almost solely to a detailed description of his series of crimes, arrests, and incarcerations. Since the record at the first proceeding contains no other evidence which could properly present this past history, defendant contends that the prosecution failed to establish the corpus delicti of these past offenses which he allegedly committed. We have held that, at the penalty stage of a trial, if the prosecution attempts to introduce evidence of a past offense, defendant's extrajudicial confession to the offense is not admissible "without proof *aliunde* that such a crime had been committed." (*People* v. *Hamilton* (1963) 60 Cal.2d 105, 129 [32 Cal.Rptr. 4, 383 P.2d 412]; see *People* v. *Hines* (1964) 61 Cal.2d 164, 174 [37 Cal.Rptr. 622, 390 P.2d 398].)

In the instant case the psychiatrists' testimony of defendant's extrajudicial admissions and the transcript of defendant's testimony at the first penalty trial, which the prosecution read at the second penalty trial, comprised the only evidence of past offenses committed by defendant. If we assume that the transcript of the testimony was not erroneously admitted, we believe that the corpus delicti was properly established; defendant's former testimony would

not, for this purpose, constitute an extrajudicial declaration. We said in *People* v. *Amaya* (1952) 40 Cal.2d 70, at pages 75-76 [251 P.2d 324] : " [T]he corpus delicti must be proved by evidence independent of the extrajudicial declarations and statements of the defendant . . . so that he may be protected against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator." Here we cannot suppose that the prosecution fabricated the report of defendant's testimony at the first penalty trial; indeed, that record is now before us.

Without doubt, the safeguards surrounding a judicial proceeding will, except in extraordinary circumstances, operate to prevent the introduction of a pathologically false or coerced confession (cf. Note (1955) 103 U.Pa.L.Rev. 638, 669) ; we thus allow a testimonial confession to establish the corpus delicti (*People* v. *Ditson* (1962) 57 Cal.2d 415, 445-446 [20 Cal.Rptr. 165, 369 P.2d 714] ). Although the transcript of testimony given at a former trial technically constitutes hearsay, we hold that it is competent to establish the corpus delicti.[3]

 We turn to defendant's fourth major contention. He urges that the court erred in permitting the prosecution to read into evidence testimony of a girl, given at the guilt trial, that two weeks before the killing, defendant, by placing his hand over her nose and mouth and making it hard for her to breathe, forced her to engage in sexual intercourse with him. At the second penalty trial the deputy district attorney stated that the girl presently lived in Wisconsin; the trial court's admission of the former testimony accorded with former Penal Code section 686.[4]

---

[3]The court in *People* v. *LaRue* (1923) 62 Cal.App. 276 [216 P. 627], held that defendant's testimony at another trial was not competent to establish the corpus delicti, but in that case the defendants were not on trial in the action at which they first testified. We also distinguish *People* v. *Chadwick* (1906) 4 Cal.App. 63 [87 P. 384, 389] ; there the incriminating testimony of defendant was not relevant to the subject of the trial at which it was given (*id.* at p. 74).

[4]That section, prior to the adoption of the Evidence Code, read in part: "In a criminal action the defendant is entitled: . . . 3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that . . . the testimony on behalf of the people or the defendant of a witness deceased, insane, out of jurisdiction, or who can not, with due diligence, be found within the state, given on a former trial of the action in the presence of the defendant who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, may be admitted." Penal Code section 1204, cited by defendant, does not apply to a penalty trial. (*People* v. *Purvis* (1959) 52 Cal.2d 871, 883 [346 P.2d 22].)

We must consider, however, whether the name of this witness had been obtained from defendant in violation of *People* v. *Dorado, supra,* 62 Cal.2d 338, or *In re Spencer, supra,* 63 Cal.2d 400. At the time of the killing the girl lived in Lompoc, California, some distance from Orange County. She testified that she told no one except her boy friend about the incident until two police officers from Orange County came to ask her about it shortly before trial. It appears from the record at the second penalty trial that defendant told at least one court-appointed psychiatrist that he previously had apparently forcible sexual intercourse with a girl friend named Sally.

From this record we conclude that it is probable that the police obtained the witness's name from defendant either by direct interrogation or by following up information given to the psychiatrist by defendant before defendant was advised of his constitutional rights.

In *People* v. *Schaumloffel* (1959) 53 Cal.2d 96 [346 P.2d 393] (per curiam), we reversed an abortion conviction based in part upon the testimony of women whose names were secured from the defendant's desk diary, which had been seized in the course of an unlawful search. Although Justice Spence dissented from the court's conclusion that the search was unlawful, the court apparently unanimously concurred in the view that testimony of a witness whose identity is secured through police illegality may not be used to support a criminal conviction. The court cited and followed *People* v. *Martin* (1942) 382 Ill. 192 [46 N.E.2d 997], a case in which the names of certain witnesses were allegedly discovered by illegal search and seizure. In *Martin,* the Illinois court held that, once it appears that the name of a witness was illegally obtained, the testimony of that witness must be suppressed unless the record affirmatively supports the prosecution's claim that the testimony of the witness was received from an independent, untainted source. (382 Ill. at pp. 202-203.) [5]

The remaining six errors which defendant contends occurred at the penalty trial may be briefly treated. First, he

---

[5] We note that when defendant took the stand at the guilt trial he discussed this earlier incident. He testified that he had put his hand over Sally's mouth and nose but that she had been able to breathe. He claimed that she then voluntarily engaged in sexual intercourse with him.

This part of defendant's testimony, which was read into evidence at the instant penalty trial, may very well have been induced by Sally's earlier testimony at the guilt trial. We doubt that defendant would have unnecessarily incriminated himself by including this separate incident in his testimony unless he had felt it necessary to try to minimize the impact of Sally's testimony. (Cf. *People* v. *Bilderbach* (1965) 62 Cal.2d 757, 763-768 [44 Cal.Rptr. 313, 401 P.2d 921].)

argues that the trial court should have instructed the jury that his oral admissions reported at trial should be viewed with caution.[6] We said in *People* v. *Bemis* (1949) 33 Cal.2d 395, at page 400 [202 P.2d 82] : "The . . . instruction that evidence of oral admissions is to be viewed with caution is designed to aid the jury in determining whether an admission or confession was in fact made." If the involved oral admissions consist of defendant's own testimony at a former trial we do not think it is a "proper occasion" for the judge so to instruct the jury; no doubt arises that defendant did in fact give this testimony.[7]

Second, defendant attacks the trial court's instructions to the jury on the function of the Adult Authority. The instructions correctly followed our holding in *People* v. *Morse* (1964) 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810].

Third, defendant contends that Penal Code section 190.1 is unconstitutional becuase it gives the jury at the penalty trial unlimited discretion in choosing between life and death as punishment; we have upheld the constitutionality of the section. (*In re Anderson* (1968) 69 Cal.2d 613, 621-629 [73 Cal.Rptr. 21, 447 P.2d 117].)

Fourth, we have held that the imposition of the death penalty does not constitute cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution. (*People* v. *Bashor* (1957) 48 Cal.2d 763, 765 [312 P.2d 255].)

Fifth, defendant alleges error in that during the jury *voir dire* examination the prosecution studied a list containing unspecified information on prospective jurors. Defendant moved to inspect the list, but the trial court ruled against the motion. The court, however, did offer to rule on any motion designed to obtain specific information. In *People* v. *Superior Court* (1959) 175 Cal.App.2d 830 [1 Cal.Rptr. 55, 78 A.L.R.2d 306], the court held that the district attorney was not required to furnish to defendant *all* the information he possessed as to prospective jurors.

---

[6]Former Code of Civil Procedure section 2061 reads in part: "[The jury] are, however, to be instructed by the Court on all proper occasions: . . . 4. . . . the evidence of the oral admissions of a party [ought to be viewed] with caution."

[7]The trial court, however, should have given the cautionary instruction with reference to defendant's extrajudicial admissions to the court-appointed psychiatrists, but, since defendant called two of the psychiatrists as his own witnesses, we are certain that he did make these admissions. (See *People* v. *Bemis, supra,* 33 Cal.2d 395, 400.)

▆ Defendant finally contends that he has been once placed in jeopardy of death because in the absence of errors at the first penalty trial a more favorable result to defendant was reasonably probable. The contention cannot stand; we set aside the judgment in the first penalty trial at the request of defendant. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677] ; *People* v. *Green* (1956) 47 Cal.2d 209, 235 [302 P.2d 307].)

The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Traynor, C. J., Burke, J., Sullivan, J., and Roth, J. pro tem.,* concurred.

McCOMB, J.—I would affirm the judgment in its entirety.

PETERS, J.—I concur with the reversal of the death penalty, but I am of the opinion that the judgment of guilt should also be reversed.

The majority admit that the second and third confessions were introduced into evidence in violation of the rules laid down in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], but hold such admission was not prejudicial because the first confession was properly admitted. I disagree with the holding that the first confession was admissible, and this necessarily decides that the erroneous admission of the second and third confessions was prejudicial.

The first confession was not admissible. When secured, as held by the majority, the accusatory stage had been reached, and the defendant was handcuffed and in custody. It was not spontaneously or voluntarily made. It was given in response to the prompting of the officers, as the statement of facts given in the majority opinion illustrates. Under well settled principles it was inadmissible.

The erroneous admission of the second and third confessions which is held nonprejudicial on the authority of *People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555] and *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862], was in fact prejudicial. In my opinion these two cases were wrongly decided, but even if correctly decided, since the first confession was inadmissible, they are not applicable. Even if the first confession were admissible this

---

*Assigned by the Chairman of the Judicial Council.

court should not say, as a matter of law, that the erroneous admission of the much more detailed second and third confessions was not prejudicial. This court cannot say, as a matter of law, that the wrongful admission of the last two confessions could not reasonably have affected at least one juror. The court is neither omnipotent nor omniscient.

I would reverse both the guilt and penalty judgments.