General (Snooks) DENNIS, Jr., Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Feb. 26, 1971.

R. B. Bertram, E. G. Bertram, Jr., Bertram & Bertram, Monticello, for appellant.

John B. Breckinridge, Atty. Gen., David E. Murrell, Asst. Atty. Gen., Frankfort, for appellee.

DAVIS, Commissioner.

General (Snooks) Dennis, Jr., was charged with the murder of James Hunter. He was found guilty of voluntary manslaughter; the jury fixed his punishment at imprisonment for eight years. On this appeal he attacks the judgment of conviction, asserting that (1) incompetent evidence was admitted against him; (2) the court failed to instruct on the whole law of the case; (3) improper comments by the Commonwealth's attorney were prejudicial; (4) a peremptory instruction of acquittal should have been given; and (5) a witness was permitted to testify against him in violation of the rule requiring separation of witnesses.

The fatal encounter between appellant Dennis and Hunter occurred on January 13, 1968, when the ground was covered with snow. Both Dennis and Hunter had been drinking and were somewhat intoxicated. The two men had two encounters on the fatal day. The first one appears to have been an exchange of angry threats and assertions of intended violence toward Hunter by Dennis. This first confrontation was not attended by any physical violence.

About half an hour later Dennis was walking up a hill, as he said, to go for whiskey. Hunter, who had been watching television with witness Alan Duncan, evidently observed Dennis as he passed near Duncan's house. Duncan, testifying for the Commonwealth, recounted that Hunter followed Dennis up the hill. According to Duncan, Dennis said to Hunter, "Let's forget it," and proposed to buy some whiskey and share it with Hunter.

Then, according to Duncan's evidence: "James [Hunter] said, 'don't move,' said 'I can kill you with either hand' and then they got up there and they tied up and James [Hunter] turned to come back down the hill, Snooks [Dennis] must have cut him then because he slid and fell on his back when he was coming down the hill." Duncan did not see any weapon.

Appellant's version of the affray was much the same as Duncan's, with certain significant differences. Appellant said that although he insisted that he and Hunter should be reconciled Hunter drew a knife on him and assaulted him. Then, said Dennis, he "throwed the man down." In describing the affair, after he had thrown Hunter down, Dennis testified:

"I went down to him. I went down, I fell to him. We both got back up and he come up but I didn't see no blood at that time. I did not. I throwed the man down again and I got up and I saw some blood on my arm and I thought I was cut."

After relating that he had never taken his own pocket knife from his pocket and that he was completely unarmed during the encounter, Dennis was asked to explain how Hunter received his wound:

"Q. Do you know of your own knowledge how he got cut if he was cut, about the stomach here?

A. Unless when I throwed him down on his side and cut hisself. That's all I could tell you."

Several witnesses viewed the affair from a distance. They told of seeing Dennis make "two strikes" at Hunter as the men were down. No witness, except Dennis, saw any knife. Hunter bled profusely. He managed to rise, only to stagger a few paces and fall again. He was placed in an ambulance, en route to Somerset, but died before receiving medical attention.

Dennis fled from the scene at a "fast trot," pulling off his heavy undershirt as he did so. His course led him directly to two Monticello police officers who had come to the neighborhood as the result of information that "some trouble" was afoot between Dennis and Hunter. The officers noticed some blood on Dennis' right arm and that he was intoxicated. They arrested him for public drunkenness. The officers said that after they had arrested Dennis for public intoxication, and as the patrol car door was opened for him to enter, one of them asked Dennis what happened, to which he responded that he had "cut him a damned nigger." (Hunter was a Negro man, age 30, of somewhat larger stature than Dennis, a Caucasian.)

■ Appellant insists that the court erred in permitting the officers to testify concerning this statement, since the officers conceded that they had not given the "Miranda" warnings prior to Dennis' statement. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974. Countering this, the Commonwealth cites Ballard v. State, Tenn.Cr.App., 454 S.W.2d 193, in which it was ruled proper to admit defendant's statement "I shot her" made in response to inquiry by the first peace officer at a homicide scene as to what had happened. The Tennessee court quoted with approval similar decisions, People v. Quicke, 71 Cal.2d 502, 78 Cal. Rptr. 683, 455 P.2d 787, and State v. Barnes, 54 N.J. 1, 252 A.2d 398. Each of the cases just cited appears to rest on the proposition

that the statements made were not the result of planned custodial interrogation envisioned by Miranda.

In the case at bar the officers had no information relating to any specific crime, and certainly were not interrogating Dennis respecting a charge of homicide or malicious cutting. In these circumstances Dennis' statement was merely a voluntary comment, not produced by custodial interrogation; hence, the court correctly ruled that the Miranda principles were inapplicable.

■ Appellant contends that prejudicial error resulted from the court's refusal to affirmatively instruct on the theory of accidental homicide. In support of that position appellant relies on Monson v. Commonwealth, Ky., 294 S.W.2d 78, and Childers v. Commonwealth, Ky., 254 S.W.2d 704. Other decisions, some cited in the opinions just mentioned, collated in 10A West's Kentucky Digest Homicide ☜304, treat the subject of the propriety, vel-non, of such an instruction. Assuming, without deciding, that the circumstances of this case would have warranted the giving of an instruction on accidental homicide in light of previous decisions, the court is of the view that no such instruction was required, and failure to give it was not prejudicial. In each instruction presenting the case to the jury, the court required the jury to believe and find that the accused had "willfully" done the act or acts producing the homicide. The word "willful" was defined by the court as meaning "intentional, not accidental." In these circumstances, it is apparent that the jury was fully apprised of its prerogative to acquit appellant if it entertained reasonable doubt of his having "willfully" committed the offense. Although earlier decisions have resulted in reversal of convictions for the failure to affirmatively instruct on accidental homicide, the court entertains doubt of the soundness of such cases. It is not necessary to determine here that an instruction on accidental homicide should never be given. It suffices to observe that no such

instruction was required in this case, and its omission was harmless, even if it could be regarded as erroneous. RCr 9.24.

■ There is no merit in the claim of improper comment of the Commonwealth's attorney in closing argument. The challenged remarks consisted of the attorney's reference to facial expressions exhibited by the appellant during trial. The record fails to reveal whether the accused, in fact, exhibited the facial expressions mentioned. There is no showing, by affidavits or otherwise, in this regard. In these circumstances, this court must rely on the discretion and opportunity for personal observation possessed by the trial judge.

Appellant was not entitled to a peremptory instruction of acquittal. There was abundant evidence tending to show that the appellant deliberately inflicted the wound upon Hunter. Although the pocket knife of appellant bore no blood stain, it does not follow that appellant's innocence was thus established. Appellant testified that Hunter had a knife, and clearly implied that the wound had been inflicted with that knife. The circumstances were such that the jury could conclude that appellant stabbed Hunter with a knife, even though the knife was not found or accounted for.

Neither was there a failure of proof pertaining to the cause of death. A mortician described the wound as a cut in the decedent's abdomen just below the navel, approximately two inches long, and expressed an opinion that the wound had caused death. The witness did not reveal qualification, by training or experience, to warrant his expressing an opinion as a medical or scientific expert. However, in view of the vast quantity of blood lost by Hunter, his apparent robust health just before the wounding, his age (about thirty years), his immediate disablement following the fight,

and his death so shortly afterward, the requisite continuity and connection between the inflicted violence and ensuing death were shown, without the necessity of medical evidence. Mason v. Commonwealth, Ky., 423 S.W.2d 532. See also White v. Commonwealth, Ky., 360 S.W.2d 198, 201, in which it was stated:

> "The established rule is that the cause of a death may be proved only by medical testimony, except where the facts proved are such that any layman of average intelligence would know from his own knowledge and experience that the injuries described are sufficient to produce death (citing cases)."

In White the evidence of injuries to decedent was deemed insufficient to bring that case within the exception. In the present case the evidence was sufficient to permit submission to the jury of the issue of the cause of death without medical evidence. See Harvey v. Commonwealth, Ky., 318 S.W.2d 868.

■ Appellant complains that the court permitted police officer Bates to testify when it appeared that Bates had heard other witnesses, contrary to the separation-of-witnesses rule. RCr 9.48. This ruling addressed itself to the sound discretion of the court. Ragland v. Commonwealth, Ky., 421 S.W.2d 79. The officer's testimony was substantially the same as previously given by his fellow officer. It was, to that extent, cumulative. There is nothing in his evidence to suggest that he had taken a cue from the preceding witnesses, nor that he was "parroting" them. In these circumstances, it cannot be said that the trial court abused its discretion by permitting the witness to testify.

The judgment is affirmed.

All concur.