·Damon PEACE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Dec. 1, 1972.

Rehearing Denied Feb. 16, 1973.

C. B. Upton, Williamsburg, for appellant.

Ed W. Hancock, Atty. Gen., James M. Ringo, Asst. Atty. Gen., Frankfort, for appellee.

STEINFELD, Chief Justice.

Appellant Damon Peace, age 31 years, was convicted of murdering his wife, Mary Peace, age 20 years, his son Damon Clark Peace and his daughter Zola Peace, ages 4 years and 3 years respectively. (KRS 435.010.) Damon and Mary had been married about five years and had two other children, one 18 months old and the other 3 months old. Peace was sentenced to life imprisonment. A motion for a new trial was made and overruled. He appeals. We affirm.

Damon's principal argument for reversal is that there was insufficient evidence to support his conviction, wherefore it is necessary to relate in detail the evidence which was adduced by the Commonwealth.

On the afternoon of April 19, 1969, Damon, Mary and their four children were at Mary's four-room, frame house located in a rural area of Whitley County. Clifton Sawyers, an acquaintance of both Damon and Mary, drove by and was asked by Mary to take her family to the residence of Damon's mother some miles away. Enroute Damon remarked that if he ever caught Mary with another man he would kill her but wouldn't bother the man, and that Mary should "sell it instead of giving it away." Mary and Damon had been experiencing marital difficulties and Mary had been sharing her time and affection with Sawyers.

Sawyers left Damon at his mother's house, then, after making several stops for groceries, supplies and other purposes, he drove Mary and the children back to their home arriving there about 6:00 PM. He departed but returned about 8:00 PM and parked his car behind the house where it was not visible from the road. Mary got into the car with Sawyers, where they remained until near midnight. The four children were inside the house which had no electric power—it was lighted by a kerosene lamp on the mantle. There were open fireplaces in the rooms but evidence did not indicate the burning of a fire or the lamp during the night in question. From the car Mary observed a light come on in the house and ran in with Sawyers following. Twice he heard her holler "No, Da-

mon, don't. Clifton, help." When Sawyers reached the door the house was ablaze. Mary met him with the two youngest children in her arms and said "Go get the other two." He tried but "the fire was too big." Mary then dashed by him into the house, after leaving the two rescued babies between the house and the car. Sawyers heard her scream but never saw her again. He was asked and answered:

"Q135 Was there any extra kerosene in the house?

A I don't know.

Q136 At least when you looked the house went up in fire all at one time.

A It got in all the rooms."

Sawyers picked up the two babies and headed up the road behind the house. Soon he heard a car horn blowing and saw a car start down the hollow. He described it as a 4-cylinder Pontiac Tempest belonging to George Reeves. (The next day Damon Peace was seen at the burned Peace house and elsewhere driving the Pontiac Tempest automobile owned by George Reeves.) Sawyers was asked if he knew whose automobile horn was blowing, to which he replied "I guess it was mine." He made his way through the woods to the George Gibbs house about one-half mile away. Several members of the Gibbs family (including Mrs. Hubert Elliott) were there when he arrived with the two babies.

Near midnight Mrs. Elliott heard the scream of a woman, a loud "bang", and then the sound of an automobile horn which continued unusually long. She immediately awakened Mr. Elliott and both observed the burning Peace home. They aroused their neighbors and went to the Gibbs house. The rescue squad was called and arrived later.

George Gibbs corroborated the facts related by the Elliotts. Gibbs, a state trooper, a member of the rescue squad and others went to the Peace house after 2:00 AM and found it completely destroyed by the fire. In the ruins they saw the burned, unidentifiable skeletons of an adult human and two small children. The adult " * * was lying against the bed springs", one of the children " * * * was lying up like it had been lying on one end of the bed, and the other one was down in another end, like it had been in a chair * * * there was a set of small springs under its body." They observed Sawyers' burned automobile in the rear of the house.

One witness testified that about a week before Mary died, Damon, while in the witness' home, struck Mary in the face with his fist. Damon and Mary left together and when Mary returned " * * * she had been beat up. She had a big bruise on her face and her hair had been pulled out until she could rake her hand and big hands full come out, and she didn't have to pull it."

At the conclusion of the proof offered by the Commonwealth a motion for a directed verdict of acquittal was made and overruled. Damon denied any guilt and introduced evidence to establish an alibi, that at the time of the fire he was at his mother's home. He also attempted to destroy the probative value as evidence of Mary's statement "No, Damon, don't. Clifton, help", insisting that when Mary was mad at their son * * * she would call him Damon Clarkie." Offsetting this claim was the testimony of Mary's mother who stated that the child was never called Damon but was always referred to as "Clarkie".

On this appeal Damon's counsel argues that there is no evidence, direct or circumstantial, showing that a crime was committed in connection with the death of Mary and the two children. Also he claims that "There is not a speck of acceptable and competent testimony that incriminates appellant in the deaths of his wife and children. Not a witness saw appellant at or near the scene of the fire that allegedly took the lives of Mary, Damon and Zola

Peace. Not a witness testified as to what or who caused the fire, so its origin is yet a mystery. Not a witness could assign a motive as to why appellant wanted to kill his wife and his two infant children." Specifically, he contends that "there is no evidence of probative value that establishes the corpus delicti." He says that "The test * * * requires the corpus delicti to be 'proven beyond a reasonable doubt' " and that " * * * if the corpus delicti is attempted to be established by circumstantial evidence (as in the instant case), it must be so established positively to exclude all uncertainty or doubt about it." Roberson's New Kentucky Criminal Law and Procedure, Secs. 1779–1782.

There was testimony of Damon's hostility toward Mary, of his brutality to her, of his threat to kill her if she was found with another man, of the same automobile which Damon was driving the following day being seen leaving the burning house, and of Mary's exclamations "No, Damon, don't." Mary asked Sawyers to rescue the other two babies and when he was unable to do so Mary reentered the blazing house.

 Proof of corpus delicti in murder has two elements—(1) death as a result and (2) the criminal agency of another as the means. Warnell v. Commonwealth, Ky., 246 S.W.2d 144 (1952). It may be established by circumstantial evidence. Goodman v. Commonwealth, Ky., 285 S.W.2d 146 (1955). The evidence sufficiently identified the three burned torsos and showed " * * * circumstances which point strongly to a criminal agency as the cause of death and sufficiently establish the corpus delicti." · Dolan v. Commonwealth, Ky., 468 S.W.2d 277 (1971). The evidence was of sufficient probative value to support the verdict.

On Sunday, April 20, 1969, Peace was arrested on a warrant as he emerged from a church and started to get into George Reeves' Pontiac automobile. The two police officers testified that after they had arrested Damon he denied the charge that had been placed against him and was very emotional. The officers commented as to the conversation which occurred when he was being driven to jail. One officer was asked and answered as follows:

"Q19 Go ahead.

A Damon—I advised him of his rights at that time and informed him of what the charges were contained in the warrant. We placed him in a police car at that time.

Q20 What was his condition as to whether he was sober or drunk on that occasion?

Mr. Upton (Attorney for Appellant): Objection

The Court: He may tell the condition, if he knows.

A He appeared to be drinking.

Q21 Go ahead.

A Again, as I say, I informed him of his rights of self-incrimination and so forth, and informed him of the charge that had been placed against him, and right at that particular moment it didn't seem to bother him a great deal but when we got in the car and started, he became emotional. We were traveling back to Williamsburg from Harps Creek in order to place him in jail. On the way back, Damon talked to some extent. He denied—

Mr. Upton: Just a minute—go ahead.

A He denied the charge that had been placed against him. He said he was not guilty of that. He stated on the way back that he had gone to his mother's home. He had been home with his wife the day before and that they had become engaged in an argument and he decided to leave and go to his

mother's home. He said he was there at her house Saturday night, the night of the fire.

Q22 Go ahead. Was anything else said in connection with this incident?

A Let me think. I've lost my train of thought. On the way in, Damon asked if the death penalty in Kentucky was still in effect. We told him it was but very seldom was used any more. He made a statement to the effect that he might be able to get off with ten years. The statement was in connection with the charges that he knew had been placed against him."

The foregoing testimony was that of Detective Robert Cox, following which counsel for Peace, out of the presence of the jury, moved the court to admonish the jury not to consider the testimony of the detective " * * * about any statement that the defendant, Damon Peace, is alleged to have made as he testified to because the witness testified that the defendant appeared to be drinking and appeared to be very emotional." The motion was overruled. It is insisted that this was error.

■ There is no showing that the police officers interrogated the appellant but, on the contrary, it appears that he voluntarily started talking. The evidence was properly admitted and the failure to admonish the jury was not error inasmuch as these statements were voluntarily made and not in response to any custodial interrogation. See Dennis v. Commonwealth, Ky., 464 S.W.2d 253 (1971).

■ Peace also charges that he was not given the Miranda warnings (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966)), thereby making it improper to permit the introduction of statements allegedly made by Peace without being so warned. The officers testified that they gave the Miranda warnings. Furthermore, the statements which Peace made were not in response to interrogation. We find no error in the admission into evidence of the statements which Peace made to the officers.

■ Finally appellant argues that during the closing argument the attorney for the Commonwealth made the following remarks which were highly prejudicial and improper:

"* * * If he's been one thing of what I've proved to society and to that little girl, 20 years old, and those little infant babies in eternity and two in the world, if he's worth one nickle, you turn him loose. If he's taken out of society, there'll be no loss.

Mr. Upton (Attorney for Appellant): Move the Court to exclude that type of argument.

The Court: Go ahead.

Mr. Teague (Commonwealth's Attorney): Thank you, Judge. The Judge has allowed me to go on and say you stand up. I stood up for that little boy in eternity, no law enforcement officers, nobody connected. How could a little boy get to things on a mantle, no lights. This was brought to my attention by a fine person. Not a law enforcement agency representative. If you think you can do that and aid society, you go ahead."

It is our opinion that these comments did not exceed the bounds of propriety. Hunt v. Commonwealth, Ky., 466 S.W.2d 957 (1971); Harness v. Commonwealth, Ky., 475 S.W.2d 485 (1972); and Koonce v. Commonwealth, Ky., 452 S.W.2d 822 (1970).

It therefore appears to us that the judgment should be and it is affirmed.

All concur.