[Crim. No. 10022. First Dist., Div. Two. Sept. 27, 1972.]

THE PEOPLE, Plaintiff and Appellant, v.
HENRY S. TARTER, Defendant and Respondent.

## COUNSEL

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Joyce F. Nedde and Eugene Kaster, Deputy Attorneys General, for Plaintiff and Appellant.

James C. Hooley, Public Defender, and Richard L. Howard, Assistant Public Defender, for Defendant and Respondent.

**OPINION**

**ROUSE, J.**—The People appeal from an order of the trial court granting a new trial.

On March 8, 1971, defendant was convicted of the crime of robbery, in violation of section 211 of the Penal Code. The jury also found a charge of being armed with and using a deadly weapon during the commission of said offense to be true. The trial court thereafter granted defendant's motion for a new trial on the sole basis that it had erred in admitting evidence of a conversation which occurred between the defendant and a deputy sheriff during the trial proceedings.

The facts disclose that a Mrs. Henry, an employee of a Fotomat booth, was the victim of a robbery which occurred at approximately 5:50 p.m. on October 3, 1970; that the perpetrator of the offense pointed a small black automatic pistol at her and demanded money; that she handed him her supply of currency as well as a small amount of change from the cash register and he then left the scene. Within the ensuing three to four weeks, on three separate occasions, the victim examined groups of photographs. On the last occasion she identified a photograph of defendant as the person who had committed the offense. Defendant was arrested on December 3, 1970, and on December 4, 1970, Mrs. Henry identified him in a lineup. In a hearing conducted out of the presence of the jury, the trial judge made a finding that the victim's identification of defendant was based on her independent recollection of the robbery and not upon her recollection of the photographs or lineup.

In his opening statement defense counsel told the jury that the case for the defense was one of mistaken identity and that the defendant would testify that he did not do it. Thereafter, the defendant testified that he did not rob Mrs. Henry; that he had stopped by her booth four or five times on other occasions because he found her to be an attractive woman. He was unable to recall what he had been doing on the day of the robbery, but thought he had been in the company of some casual acquaintances.

During cross-examination the defendant denied having ever told anyone that he had robbed Mrs. Henry. At that point the district attorney initiated an inquiry concerning a conversation which defendant had had with the marshal, a deputy sheriff. Defense counsel objected to any further inquiry in the absence of a showing, whereupon, at the district attorney's suggestion, the court directed that proceedings be moved from open court into chambers. During the hearing which followed, out of the presence of the jury, the district attorney offered to prove that defendant had a conversa-

tion with the marshal in the courtroom, during the course of which defendant had admitted the robbery and had given certain details concerning its commission. The district attorney then examined the marshal, who testified to the details of the conversation and described the circumstances under which it had taken place. The marshal admitted that defendant had not been advised of his constitutional rights per *Miranda*. In addition to his description of certain admissions made by the defendant, the marshal testified that his normal responsibilities as bailiff included transporting the defendant to and from jail, maintaining custody of the defendant and securing order in the courtroom. Under the circumstances, he thought it permissible to talk to the defendant even though his attorney was not present during their conversation. The marshal testified that he had only questioned the defendant about the offense in order to form a basis for his opinion as to what defendant might receive by way of sentence if he (defendant) was convicted. Defendant had initiated the conversation by soliciting that opinion from him. The marshal estimated that the conversation lasted less than five minutes.

Following a thorough and extensive cross-examination by defense counsel and the presentation of testimony by defendant tending to rebut such evidence, the court heard arguments by counsel and later announced its decision to admit the evidence.

Upon resumption of the trial before the jury, the district attorney pursued his inquiry on cross-examination. During further examination, the defendant admitted conversing with the marshal on the occasion in question but denied that he had admitted the commission of the offense. On recross-examination defendant confirmed his story that he did not rob Mrs. Henry.

Following completion of the defendant's case, the district attorney called the marshal as a rebuttal witness. A verbatim transcript of that testimony on direct examination follows: "[Deputy District Attorney]: Q. Mr. Baldwin, what's your occupation? A. Deputy Sheriff, Alameda County. Q. How long have you been so employed? A. Approximately eight months. Q. Are you also going to school? A. Yes, I am. Q. Where are you going to school? A. University of San Francisco Law School. Q. Calling your attention to, first, last Thursday, March 4th, in the afternoon, were you present in this courtroom? A. Last Thursday? I do not believe so. Q. Calling your attention to Friday morning, March 5th, were you present in the courtroom? A. Yes, I was. Q. Did you have charge and custody of Mr. Henry Tartar? A. Yes, I did. Q. Did you bring him down to the court that morning? A. Yes, I did. Q. After you brought him down to court, who was present in the courtroom? A. As I recall, I believe the Clerk was here,

myself, and Deputy Tanner. Q. Now, at that time did the defendant ask you any questions? A. Yes, he did. Q. What is the first question the defendant asked you? A. He asked for my opinion as to what I thought his sentence would be if he were convicted, in light of the fact he had no prior record. Q. Now, when he asked you that question, had you made any statement to him or—strike that. Had you asked him any questions prior to the time he asked you that question? A. No. Q. What if anything did you say? A. I asked him if he was sure that he wanted my opinion. Q. And what did he say? A. He repeated himself again. Q. And then what happened? A. I asked how much he got in the robbery. Q. What did he say? A. He says $7.50. Q. And what did you say next? A. I asked him if anyone was hurt in the course of the robbery. Q. What did he say? A. He said, 'No.' Q. What was the next question you asked him? A. I asked if he was armed. Q. What did he say? A. He said, 'Yes.' Q. What was the next question you asked? A. I asked him if the gun was loaded. Q. What did he say? A. He said 'No, it wasn't.' Q. Did you ask any other questions? A. I asked if he had a family. Q. What did he say? A. He said he had a child, but wasn't married. Q. What did you ask him next, if anything? A. I asked him if he had a job or was going to school. Q. What did he say? A. I believe he said he was in his first year at Laney College. Q. Did you ask him any further questions? A. We discussed school for a few moments, and after which I asked him why he had committed the robbery. Q. And what did he say? A. He said that he was short of funds after being out of the service. Q. Now, this conversation—where were you when the conversation took place? A. He was seated at the very end of the counsel table and I was seated in the—a chair next to the bar right in front of Mr. Tanner's desk. There's no chair there now, but there was then. Q. Now, was he seated where he is now or further over on the last— A. At the very end of the table, the next chair over. Q. The one that's empty there now? A. Correct. [Deputy District Attorney]: Thank you. I have no further questions."

During cross and redirect examination the marshal testified that he had not been told to interrogate the defendant; that defendant's attorney was not present during the conversation with the defendant; that he had not told the district attorney about the conversation until after defense counsel had made his opening statement; that he had not been present in court while the defendant was testifying; that prior to writing a statement about the conversation for the district attorney, he had made an appointment with the public defender to tell him about the conversation.

The defendant was recalled to the stand and admitted initiating the conversation with the marshal by asking his opinion on what he thought de-

fendant might get if convicted.[1] He denied making any statements involving him in the commission of the offense, however. At the request of defense counsel, the trial court then instructed the jury that such testimony was not evidence of the truth of the matters asserted but could be used by them only for the purpose of impeaching the testimony of the defendant if they found it to be impeaching; that it was not admitted for any other purpose.

Following completion of closing arguments of counsel and as part of its instructions to the jury, the court again admonished the jury concerning its consideration of evidence which had been admitted for a limited purpose. After deliberation, the jury returned its verdict finding defendant guilty of robbery of the first degree; further, finding that the allegation that defendant was armed with a deadly weapon and had used such weapon in the commission of the offense was true. The trial court subsequently granted defendant's motion for a new trial on the basis that it had committed prejudicial error in admitting evidence of defendant's conversation with the marshal.

The Attorney General has appealed from that order under the authority of section 1238, subdivision (3), of the Penal Code. He argues on appeal, first, that neither *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], nor *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199], bans admission of the conversation for any purpose; and, second, that even if the conversation were deemed violative of either *Miranda* or *Massiah,* it still was admissible for impeachment purposes under the authority of *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]. In response, defendant argues that *Miranda* does ban admission of incriminating statements elicited by the deputy sheriff's interrogation of defendant in the absence of a knowing and intelligent waiver of the latter's privilege against self-incrimination; further, that *Massiah* bars admission of such incriminating statements elicited by the deputy sheriff in the absence of counsel; and, finally, that the rule of the *Harris* case is not applicable to the case at bar.

We conclude that neither *Miranda* nor *Massiah* would ban the admission of the evidence here in controversy; further, that the trial court erred in granting defendant's motion for a new trial.

In *Massiah* v. *United States, supra,* a federal grand jury had indicted

---

[1]The marshal did offer an opinion during the last part of their conversation. The district attorney later "cleared the record" in a statement to the trial court (which statement was not challenged by defense counsel), quoting the marshal's opinion, as expressed to the defendant, that although he could not be sure of anything, it was his guess that the sentence would be state prison, suspended, based upon the probation condition that defendant would serve six months to one year in the county jail.

Massiah. He had retained a lawyer and entered a formal plea of not guilty. Massiah was released on bail and thereafter agents of the federal government, with the cooperation of Massiah's codefendant, placed a radio transmitter in the latter's car and thus were able to overhear a conversation between Massiah and his codefendant. The court concluded that incriminating statements were deliberately elicited by federal agents from Massiah in the absence of counsel and that the use of such statements against him at his trial denied him the basic protections of the Sixth Amendment guarantee. Thereafter, in the case of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], the United States Supreme Court dealt more specifically with police interrogation conducted in the investigatory state. The Court held that "where . . . [an] investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon* v. *Wainwright,* 372 U.S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Pp. 490-491 [12 L.Ed.2d at p. 986].)

In *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], the California Supreme Court held that a custodial interrogation of a murder suspect, an inmate of the state penitentiary, was violative of the rule announced in *Escobedo,* where there had been no advice of rights and even though the suspect had not requested counsel.

In *Miranda* v. *Arizona, Vignera* v. *New York, Westover* v. *United States,* and *California* v. *Stewart* (1966) all at 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the United States Supreme Court held that the prosecution may not use statements stemming from the custodial interrogation of the defendant unless, prior to any questioning, the person to be questioned has been warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The court defined "custodial interrogation" as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

In determining the applicability of the *Miranda* rule to the facts of the

case here before us, it seems appropriate to consider some observations made by the Supreme Court. For example, at page 445 [16 L.Ed.2d at page 707] the court said that "In each [of the cases before the court], the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. . . . They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights."

And again, at page 457 [16 L.Ed.2d at page 714]: "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation."

Elsewhere in its opinion the court pointed out that not all confessions are necessarily inadmissible. Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence.

■ In determining whether officers have carried out a process of interrogations that lent itself to eliciting incriminating statements we must analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances. (*People* v. *Quicke* (1969) 71 Cal.2d 502, 513 [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97].)

■ In examining the relevant circumstances under which the conversation here at issue took place, we find present few, if any, of the elements which were of obvious concern to the United States and California Supreme Courts. True, Mr. Tarter was in custody, care and control of the marshal. Absent from the scene, however, is any evidence of a deliberate design on the part of the marshal to elicit incriminating statements from the defendant in the absence of counsel. It was not in any sense, either real or technical, an incommunicado interrogation conducted in a police-dominated atmosphere. In reality, it was a conversation between two people, one of whom, as it happened, was a law enforcement officer and the other a person charged with a crime. It took place in an open courtroom where it seems that anyone who was then physically present might have participated. This was hardly an "interrogation environment . . . created for . . . [the] purpose . . . [of subjugating] the individual to the will of his examiner." (*Miranda* v. *Arizona, supra,* p. 457 [16 L.Ed.2d at p. 714].) Also, we think it significant that the conversation was initiated by the defendant himself. For a defendant to seek advice from someone other than his at-

torney on such matters is not an uncommon occurrence. Nor is it unusual for defendants, particularly those in custody, to confide in jailers, fellow inmates, trustees and the like, often to the complete exclusion of their own attorneys. The record in this case strongly suggests that Mr. Tarter had neither told his attorney about his conversation with the marshal nor had he given him the same version of the facts as those described to the marshal.

It it reasonable to conclude from the record before us that until defense counsel announced to the jury that the defendant would testify that he did not commit the offense, the marshal would have respected the confidence of his relationship with the defendant by saying nothing of their discussion. It was only when he learned defendant was going to testify to a different version of the events than that described in their conversation that the marshal decided to divulge the contents thereof. Further, according to his testimony, the marshal attempted to meet with defense counsel and tell him about the conversation.

We conclude that the questions asked of defendant by the marshal were not part of an interrogation designed to elicit incriminating statements, but rather were the result of a spontaneous and purely voluntary conversation which had been initiated by the defendant, and that such inquiries were made for the sole purpose of better enabling the marshal to express a more accurate opinion concerning the likely disposition of the defendant's case. Thus the situation was not one which required a preliminary recitation of constitutional rights and a waiver thereof by the defendant as contemplated by *Escobedo, Dorado* and *Miranda,* all *supra.*

Even if we were to conclude that the circumstances of the conversation were such that a warning of constitutional rights was required, then the case is one which clearly falls within the exception noted in *Harris* v. *New York, supra,* 401 U.S. 222. In that case the petitioner was asked, on cross-examination, whether he had made specific statements to the police immediately following his arrest, which statements partially contradicted his direct testimony. In response, petitioner testified that he could not remember. The trial court instructed the jury that such statements can be considered only in passing on petitioner's credibility and not as evidence of guilt. At the trial, the prosecution made no effort in its case in chief to use the statements allegedly made by the petitioner, conceding that they were inadmissible under *Miranda.* Petitioner made no claim that the statements made to the police were coerced or involuntary. In holding that such statements were admissible, the United States Supreme Court pointed out that "*Miranda* barred the prosecution from making its case with state-

ments of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (P. 224 [28 L.Ed.2d at p. 4].) Elsewhere in its opinion the court stated that "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. . . . Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . ." (P. 225 [28 L.Ed.2d at p. 4].)

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." (P. 226 [28 L.Ed.2d at p. 5].)

Here, as in *Harris,* the prosecution made no attempt to use defendant's statements as part of its case in chief. As a matter of fact, it is abundantly clear from the record that neither prosecution nor defense counsel even knew about the conversation until after the prosecutor had rested his case. Having elected to waive his privilege against self-incrimination by offering himself as a witness, the defendant cannot abuse the principles of fundamental due process by asserting a nonexistent right to avoid "confrontation with prior inconsistent utterances." (*Harris* v. *New York, supra,* p. 226 [28 L.Ed.2d at p. 5].)

The order granting defendant a new trial is reversed. The matter is remanded to the trial court for reinstatement of post-trial proceedings.

Taylor, P. J., and Kane, J., concurred.

A petition for a rehearing was denied October 13, 1972, and respondent's petition for a hearing by the Supreme Court was denied November 22, 1972. Peters, J., was of the opinion that the petition should be granted.