[Crim. No. 1486. Fifth Dist. Dec. 31, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE JESUS VARGAS, Defendant and Appellant.

500

COUNSEL

Thomas J. Tusan, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, Willard F. Jones, Peter J. McBrien, Arnold O. Overoye and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN (G. A.), P. J.**—Appellant was convicted by a jury of possession of heroin for purposes of sale in violation of Health and Safety Code section 11500.5 (count I), and possession of marijuana in violation of Health and Safety Code section 11530 (count II).

As grounds for reversal he urges failure to comply with Penal Code sections 844 and 1531 (knock and notice) prior to entry into his home to search pursuant to a warrant, improper admission of a statement taken in alleged violation of his *Miranda (Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights, and lack of proof of knowledge of the narcotic nature of the marijuana. Raised at the oral argument was the additional issue that the marijuana, soaked in alcohol, was not usable as a narcotic.

Agent Walley of the State Bureau of Narcotic Enforcement obtained a search warrant to search the person of appellant, his residence and his pickup truck for heroin. In the early afternoon he and other agents descended upon appellant at a market parking lot near appellant's home. He was told in both English and Spanish that he was being served with a search warrant and that it enabled them to search him and his vehicle. No narcotics were found in the searches of the vehicle and his person. Appellant was then handcuffed and taken to his residence by the interpreter-agent, Velasquez, and others, arriving after Agents Walley and Stoller had entered the home.

When Agents Walley, Stoller and others arrived at the home a number of children, including several in the 13 to 17 age range, were in the front yard of appellant's residence. Agent Walley approached a girl who appeared to be approximately 17 years of age, identified himself as a narcotic agent, displayed his credentials to her and asked who was inside the residence. She replied that both her mother and brother were inside the home. Walley had previously been supplied with information indicating that appellant's son, Armando, was also dealing in heroin and that his wife was well aware of the heroin activities. After Walley displayed his credentials to the girl, he turned and approached the residence. As he went toward the front door, and when about 30 feet from the home, Walley heard the voices of several children, predominantly a female voice, behind him yell, "Mama, Mama, Mama," and then some exclamatory words in Spanish which he did not understand. After hearing these yells Walley ran to the front door of the residence and, without knocking or announcing his presence, identity or purpose, opened the unlocked screen door and entered the residence through the front door which was standing open. Prior to making this entry he had heard no noise from inside the house.

Once inside the residence, Walley encountered the son, Armando Vargas, who was entering the front room from another portion of the house. There he displayed a copy of the search warrant to him. Agent Stoller entered the residence with Walley and went to a center bedroom of the residence to inspect it for occupants. There he heard a noise behind a door leading from the bedroom. Stoller announced, "Police officer, open the door," and when there was no response he kicked the door open. The door led to a bathroom wherein he observed Mrs. Vargas bending over the toilet bowl, holding a brown jar in her hands and dumping the contents of the jar into the toilet bowl. Stoller again announced himself, told her to stop, and then placed his hands on her shoulders. Mrs. Vargas then dropped the jar into the toilet

bowl, stating, "All right, all right." The jar was later found to have contained heroin. A total of 13 to 14 ounces of heroin was found in the home.

Also located in the residence among appellant's personal effects was a glass jar containing a small amount of marijuana immersed in alcohol.

While the search was in progress, appellant was taken into the house and formally placed under arrest. While the arrest was being explained to him in Spanish, he volunteered the statement that Mrs. Vargas did not know anything about it and that "the stuff is mine." This statement was not made in response to a question. Though the record is murky as to whether any contraband had been found at the time appellant volunteered this statement, there is adequate evidence to support an implied finding that the statement was made before he was confronted with any of the drugs.

After *Miranda* advisements, appellant confessed. As to the marijuana in the alcohol, he stated it was medicine for his rheumatism which he had bought in Mexico.

■ Compliance with the "knock and notice" requirements prescribed by Penal Code sections 844[1] and 1531 is excused when the officers have a reasonable belief that such compliance will permit the destruction of evidence inside the house and thereby frustrate their purposes. (*People* v. *De Santiago* (1969) 71 Cal.2d 18, 29 [76 Cal.Rptr. 809, 453 P.2d 353].) When the record contains substantial evidence to support an implied finding that the entry did not violate the knock and notice requirement due to the officer's good faith belief that the occupants were in the process of attempting to dispose of evidence, this court must uphold that finding. (*People* v. *Carrillo* (1966) 64 Cal.2d 387, 391 [50 Cal.Rptr. 185, 412 P.2d 377], cert. den. 385 U.S. 1013 [17 L.Ed.2d 549, 87 S.Ct. 723]; *People* v. *Pacheco* (1972) 27 Cal.App.3d 70, 78 [103 Cal.Rptr. 583].) ■ Under all the facts and circumstances, such substantial evidence is present here.

The officers approached the home knowing that appellant's son, Armando, was engaged in the selling of heroin and that his wife was aware of these activities. When they arrived and identified themselves as narcotics agents to one of the older Vargas girls, they were informed that both Ar-

---

[1]Penal Code section 844 provides: "To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

Penal Code section 1531, pertaining to the execution of a search warrant, contains substantially identical requirements.

mando and Mrs. Vargas were inside the house. As they turned toward the house they heard several of the children, predominantly a female voice, yelling, "Mama, Mama, Mama," and some words in Spanish they did not understand. On the basis of this information, it is apparent that the officers could justifiably have harbored a belief that the voiced words were for the purpose of shouting a warning of their presence and imminent entry and that evidence was about to be destroyed, and to have waited at the front door for an indeterminate length of time for someone to come and be informed of their identity, authority and purpose would have completely frustrated days of police investigation.

■ Furthermore, strict compliance with the knock and notice requirement is excused when the entering officers reasonably believe that the purpose of entry is already known to the occupants. (See *People* v. *Hill* (1971) 19 Cal.App.3d 306, 318 [96 Cal.Rptr. 813]; *People* v. *Perales* (1970) 4 Cal.App.3d 773, 779 [84 Cal.Rptr. 604].)

Appellant argues that by failing to take Agent Velasquez, who spoke Spanish, with them to the Vargas residence, the narcotics agents deliberately created the emergency situation which gave rise to the justification for entering the home without compliance with Penal Code sections 844 and 1531. (See *Shuey* v. *Superior Court* (1973) 30 Cal.App.3d 535 [106 Cal.Rptr. 452].) The argument is meritless. There is no evidence that the failure to take Agent Velasquez to the home was deliberate, and the fact that appellant did not speak English does not mean that the agents could not reasonably have believed that Mrs. Vargas and the children were bilingual. Moreover, the failure to have a Spanish interpreter present did not create the emergency. The facts giving rise to the justification for the entry arose from the shouting and voiced exclamations in the front yard of the home, not the absence of the Spanish interpreter.

■ We turn to the admissibility of appellant's statement made inside the house that "the stuff is mine." The statement was made while his formal arrest was being explained to him. It was made before he was confronted with any contraband that may have been found and was not made in response to any police question.

While appellant was undoubtedly in custody at that time, the totality of facts and circumstances clearly shows that the statement was volunteered and was not in response to any custodial interrogation and therefore does not fall within the proscription of *Miranda* v. *Arizona, supra,* 384 U.S. 436, and its progeny. (See *People* v. *Terry* (1970) 2 Cal.3d 362, 383 [85 Cal.

Rptr. 409, 466 P.2d 961], cert. den. 406 U.S. 912 [32 L.Ed.2d 112, 92 S.Ct. 1619]; *People* v. *Quicke* (1969) 71 Cal.2d 502, 513-514 [78 Cal. Rptr. 683, 455 P.2d 787]; *People* v. *Tarter* (1972) 27 Cal.App.3d 935, 942-943 [104 Cal.Rptr. 271].)

As to the conviction for possession of marijuana, appellant testified that the jar found among his personal effects contained medicine for his rheumatism. Both Agent Velasquez and the court interpreter, Mrs. Ostendorf, testified that a mixture of alcohol and marijuana is commonly used by persons of Mexican descent in the treatment of arthritis, rheumatism and other muscular aches and pains. Agent Velasquez and Mrs. Ostendorf said that in their opinions the substance as it then existed could not be used as a narcotic,[2] and Mrs. Ostendorf said that the substance is poisonous if taken internally. There was no evidence as to whether the substance could be converted from the condition it was then in to a form which could be used as a narcotic, for example, whether it could be dried and then used as a narcotic or if its poisonous quality would continue to render it unusable.

It is apparent that the circumstantial evidence is sufficient to support the implied finding of the jury that appellant was aware of the narcotic content of the marijuana. (*People* v. *Williams* (1971) 5 Cal.3d 211, 216 [95 Cal. Rptr. 530, 485 P.2d 1146]; *People* v. *White* (1969) 71 Cal.2d 80, 83 [75 Cal.Rptr. 208, 450 P.2d 600].)

■ However, we have concluded that the prosecution did not satisfy its burden of proof that the substance was usable as a narcotic, and in this regard are confronted with an issue of first impression.

In *People* v. *Leal* (1966) 64 Cal.2d 504, 510 [50 Cal.Rptr. 777, 413 P.2d 665], a case involving a question of usable quantity rather than usable form of a narcotic, the Supreme Court quoted with approval from *People* v. *Sullivan* (1965) 234 Cal.App.2d 562 [44 Cal.Rptr. 524]: " 'We conclude that possession of a minute crystalline residue of narcotic *not intended for consumption or sale and useless for either of these purposes* is insufficient evidence to sustain a conviction for known possession of a narcotic.' (P. 565; italics added.)"

---

[2]In answer to a leading question, Agent Velasquez said the substance could be used as a narcotic. However, close examination of his testimony in context and as a whole makes evident that he meant by that statement that the mixture could be used as a medicine for treatment of rheumatism, arthritis, etc.

The court emphasized that the objective of the section punishing possession of a narcotic was to punish for possession having a potentiality for future use or sale, that is, a narcotic potential, and that the discovery of a trace only is without legal significance.[3]

Extending and applying the logic of *Leal* to the facts in the case at bench, the conclusion is inescapable that the Legislature could not have intended to punish the possession of a substance normally used as a narcotic but possessed in a form which is unusable as a narcotic, at least in the absence of proof that the form in which it is possessed can be converted to a usable narcotic form. In the absence of such proof the substance cannot be held to have a narcotic potential as defined in *Leal*.[4]

From all that appears from the evidence herein, the marijuana mixed with alcohol could never again be used as a narcotic substance by ingestion, by smoking or otherwise.

Inasmuch as the usability of a narcotic is an element of the crime charged and the burden of proof is upon the prosecution to prove all elements of the offense (Pen. Code, § 1096; *People* v. *Loggins* (1972) 23 Cal.App.3d 597, 600-601 [100 Cal.Rptr. 528]; *People* v. *Hurley* (1936) 13 Cal.App.2d 208, 213 [56 P.2d 978] (disapproved on other grounds *People* v. *Pociask* (1939) 14 Cal.2d 679, 684 [96 P.2d 788])); and that burden has not been satisfied as to the marijuana conviction of appellant, we are required to reverse that judgment.[5]

---

[3]In *People* v. *Pohle* (1971) 20 Cal.App.3d 78 [97 Cal.Rptr. 364] and *People* v. *Fein* (1971) 4 Cal.3d 747 [94 Cal.Rptr. 607, 484 P.2d 583], the court suggested that burned, charred marijuana seeds would be useless for either a toxic effect or for growing marijuana, and thus could not be used as a basis for a conviction (in *Pohle*) or furnish probable cause for arrest (in *Fein*). See also *People* v. *Johnson* (1970) 5 Cal.App.3d 844, 848 [85 Cal.Rptr. 238], where the court stated that *Leal* stood for the proposition that a "conviction may not be predicated upon possession of a narcotic so limited in quantity or altered in form as to be useless for narcotic purposes."

[4]For example, though hemp rope is made from the fiber of the marijuana plant, it would be absurd to conclude that the Legislature intended to punish the possession of hemp rope, it obviously not being in a form which can be used as a narcotic.

See the definition of "hemp" in The American College Dictionary, Random House (1962): "1. a tall, annual moraceous herb, *Cannabis sativa*, native in Asia, but cultivated in many parts of the world. 2. the tough fiber of this plant, used for making coarse fabrics, ropes, etc. 3. an East Indian variety, *Cannabis sativa indica* (or *Cannabis indica*), of common hemp, yielding hashish, bhang, cannabin, etc. . . ."

[5]In this connection it should be noted that our holding that the marijuana must be in a usable *form* is readily distinguishable from that line of cases ruling that the

The judgment of conviction of count II (possession of marijuana) is reversed; the judgment of conviction of count I (possession of heroin for purposes of sale) is affirmed.

Gargano, J., and Franson, J., concurred.

A petition for a rehearing was denied January 21, 1974, and the petitions of the appellant and the respondent for a hearing by the Supreme Court were denied March 13, 1974.

---

prosecution need not show that the substance was of sufficient quality to produce a narcotic effect (see *People* v. *Pohle* (1971) 20 Cal.App.3d 78 [97 Cal.Rptr. 364]; *People* v. *Piper* (1971) 19 Cal.App.3d 248 [96 Cal.Rptr. 643]; *People* v. *Diamond* (1970) 10 Cal.App.3d 798 [89 Cal.Rptr. 126]), since, presumably, numerous amounts of poor quality narcotics can be combined to produce a substance which, if ingested in its entirety, would produce a narcotic effect, whereas a narcotic in an unusable form remains unusable regardless of its quality or quantity.