[Crim. No. 16868. First Dist., Div. Two. Jan. 25, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
RAY EDWARD PATTERSON, Defendant and Appellant.

**COUNSEL**

Paul N. Halvonik, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Jaime Alcabes, Linda Fentiman, Gary D. Sowards, B. E. Bergesen III and Isadora W. Lomhoff, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Timothy A. Reardon, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

KANE, J.—Defendant was charged in count 1 with violation of Penal Code,[1] section 12020 (possession of a sawed-off rifle) and in counts 2, 3,

---

[1]Unless otherwise indicated, all references will be made to the Penal Code of California.

and 4 with violation of section 211 (robbery). The information also charged defendant with the use of a sawed-off rifle in the commission of the robberies charged in counts 3 and 4. Defendant pleaded not guilty to all counts and denied the use charge.

Defendant's motion to suppress evidence under section 1538.5 was denied. At trial, defendant's motion to suppress the contents of the two statements he made to police was denied.

Defendant was tried by a jury and was found guilty of all counts as charged. The robberies were found to be in the first degree, and the use allegations were found to be true. The court ordered the defendant to be imprisoned in the state prison for the term provided by law, with the sentences to be served concurrently.

Defendant met his first victim, Victor Reynolds, in a bar in Hayward. The victim accompanied the defendant on a drive to direct him to a particular motel. Defendant stopped the car en route to the motel, leveled a sawed off rifle at the victim, and stated " 'Now, you know what this is.' " Defendant demanded Mr. Reynolds give him his wallet and place his wristwatch on the car's console. When defendant found the wallet contained only a couple of dollars, he stated, " 'You'd better have more than that, man; don't make me pull this trigger.' " The victim was told in a "crisp, businesslike, hard, demanding" manner to walk away from the car and " 'Don't look back.' " The rifle was leveled at Mr. Reynolds throughout the robbery.

The next victim, Leo Tschabuschnig, was confronted about two hours later in front of Fiesta Lanes in Hayward. Defendant's car pulled up behind the victim's car and blocked his exit. Defendant asked Mr. Tschabuschnig, " 'How do you get to Tennyson,' " but before the victim could respond he saw a weapon on the sill of defendant's car. Defendant asked " 'How about this,' " and then demanded " 'Toss me your wallet.' " After Mr. Tschabuschnig handed defendant his wallet he was told " 'Now get in your car' " and " 'Don't look back.' " The victim gave the police an accurate description of the robber's car, and observed that the driver wore a small leather cap.

The third robbery took place approximately one-half hour later at a car-wash in San Leandro. The victim, Jimmie Baker, was rinsing off his car when a white car containing two men pulled up behind his car. The passenger, a white male with "light reddish" hair, asked him where Hays

Street was, and then produced a "cut-off" rifle and demanded his wallet. After giving his wallet to the passenger, Mr. Baker was then told to go to the front of his car and continue washing it. The victim described the vehicle and its occupants to the police immediately after the robbers left the scene. Approximately three minutes after receiving a description of the robbery suspects, Officers Turner and Long stopped a white Chevrolet occupied by two males—one black, one white. The defendant, who was driving, was wearing a leather cap similar to that described by the victims. The police found a loaded sawed-off rifle under the front passenger seat and a brown paper bag containing three wallets. Mr. Reynolds' watch was also recovered.

The morning after the robberies, in statements made to the police, defendant admitted committing all three robberies. Defendant now claims he suffered from involuntary PCP (angel dust) intoxication, which made him unconscious of his actions during the robberies. Defendant's statements detailing the robberies cast doubt on his professed diminished capacity.

Two experts, a psychiatrist and a clinical researcher, testified on defendant's behalf in an attempt to show the effect PCP has on the ability to form specific intent. In rebuttal, the prosecution called Denzil Smith, an accomplice to the crime, who testified the defendant did not appear to be under the influence of PCP.

Defendant assails the judgment of conviction on four fundamental bases, by contending that: (1) his statements were obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; (2) the trial court erred in excluding certain expert testimony; (3) the trial court committed prejudicial error in instructing the jury on the effect of voluntary intoxication; and (4) the sentences imposed upon him are in violation of section 654, prohibiting multiple punishment. For reasons which follow, we must reject these contentions and affirm the judgment.

*Miranda Violations:* The record indicates that shortly after midnight on the night of the robberies, Officer Long stopped defendant's car in order to question him about the reported robberies. During the conversation with the officer, defendant made a statement to the effect that he "hadn't committed any robbery." Subsequent thereto, defendant was identified by Mr. Baker, one of the victims, and was arrested and taken to the San Leandro police station. At about 7 a.m. on October 22, 1976, while in the custody of the police, defendant gave a statement to Officer Long

admitting his participation in the commission of one of the robberies. At approximately 11:30 a.m. the same day, defendant gave another statement to Officer Wallace confessing to all three robberies. After a hearing held outside the presence of the jury, the trial court concluded that the statements made by defendant to the police were admissible in evidence. Defendant insists that the statements in question were obtained in violation of his *Miranda* rights and hence should have been excluded. We disagree.

In reviewing the admissibility of the contested evidence, we observe at the outset that the statement given by defendant to the police during the on-the-scene investigation of the crimes falls outside the protective umbrella of *Miranda.* As consistently amplified in cases, the *Miranda* warning presupposes the existence of an accused whose questioning without warning would be for accusatory, rather than investigatory, purposes (*Escobedo* v. *Illinois* (1964) 378 U.S. 478, 492 [12 L.Ed.2d 977, 986-987, 84 S.Ct. 1758]). Temporary detention, however, cannot be equated with custody; it is an investigatory, rather than accusatory, stage. As stated in *People* v. *Manis* (1969) 268 Cal.App.2d 653, 667-668 [74 Cal.Rptr. 423], "Temporary detention only slightly resembles custody . . . . True enough, a person temporarily detained has been subjected to some restraint and his freedom of movement has been temporarily restricted. But the person detained is in no sense an accused but rather one merely suspected of misconduct. Since the police can make no valid accusation against him, we do not think the process has shifted from investigatory to accusatory . . . . ■ *Until such time as the police have probable cause to make an accusation, the relationship between suspect and police remains that of citizen and peace officer rather than accused and accuser.*" (Italics added.) The holding of *Manis,* that a detention not amounting to an arrest does not trigger the need for *Miranda* warnings, finds support not only in California cases (*In re Richard T.* (1978) 79 Cal.App.3d 382, 391 [144 Cal.Rptr. 856]; *People* v. *Wheeler* (1974) 43 Cal.App.3d 898, 903 [118 Cal.Rptr. 205]; *People* v. *Herrera* (1970) 12 Cal.App.3d 629, 636-637 [90 Cal.Rptr. 802]), but also in *Miranda* itself.

■ In defining and limiting the applicability of *Miranda,* the United States Supreme Court explicitly stated that "*General on-the-scene questioning as to facts surrounding a crime* or other general questioning of citizens in the fact-finding process *is not affected by our holding.* It is an act of responsible citizenship for individuals to give whatever information they may have to aid law enforcement. *In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.*" (*Miranda* v. *Arizona, supra,* at pp. 477-478 [16

L.Ed.2d at pp. 725-726]; italics added.) But even the foregoing principles aside, the facts at bench demonstrate that the statement in question was made voluntarily by defendant and was not in response to any custodial interrogation (see discussion, *infra*). This circumstance, of course, provides yet another reason why the statement at issue does not fall within the proscription of *Miranda* and its progeny (cf. *People* v. *Vargas* (1973) 36 Cal.App.3d 499, 504 [111 Cal.Rptr. 745]; *People* v. *Coleman* (1970) 8 Cal.App.3d 722, 731-732 [87 Cal.Rptr. 554]).

We are also firmly of the opinion that the statement given by defendant to Officer Long on the morning of October 22, 1976, after his arrest and while in police custody, was equally admissible under the prevailing law and the circumstances of the instant case.

In drawing a proper line between admissible and inadmissible statements, *Miranda* underscores that the procedural protection against self-incrimination obtains only if two conditions are met: (1) the defendant is in police custody or otherwise deprived of his freedom in any significant way, and (2) is subjected to police interrogation. In the language of *Miranda,* "the prosecution may not use *statements,* whether exculpatory or inculpatory, *stemming from custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *By custodial interrogation, we mean questioning initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444 [16 L.Ed.2d at p. 706]; italics added.) The questioning prohibited by *Miranda* means "*substantive questions* which portend to develop the facts under investigation." (*People* v. *Turnage* (1975) 45 Cal.App.3d 201, 211 [119 Cal.Rptr. 237]; *United States* v. *Nielsen* (7th Cir. 1968) 392 F.2d 849, 852-853.)

At the same time *Miranda* leaves no doubt that the defendant may waive the rights accorded him by *Miranda,* if the waiver is made voluntarily, knowingly and intelligently. As the United States Supreme Court put it, "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. ■ *Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* There is no requirement that police stop a person who enters

a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. *Voluntereed statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.*" (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 478 [16 L.Ed.2d at p. 726], italics added, fn. omitted. See also *People* v. *Turnage, supra,* 45 Cal.App.3d at p. 209, fn. 3.)

■ The facts attending the incriminating statement given to Officer Long may be described as follows: Officer Long, accompanied by Officer Turner, visited defendant at the city jail, at about 7 a.m., October 22, 1976. Both officers identified themselves, and defendant was told that Officer Long wished to talk with him. Defendant was then taken to an interview room in the jail. He was not handcuffed or manacled in any way. During the movement from the cell to the interview room, defendant was given a cigarette by Officer Long. Prior to the actual questioning, a general conversation took place between Officer Long and defendant. During that conversation defendant was first advised by the officer that he did not have to say anything. Simultaneously, however, Officer Long indicated that codefendant Smith had already made a statement; that based upon Smith's statement the police had a "pretty good" case; and that if defendant gave a statement to Officer Long, this would obviate further questioning on the part of Detective Wallace. Thereupon, defendant expressed willingness to talk to the police. However, the record clearly shows that prior to taking the statement, defendant was fully advised of his *Miranda* rights.

When viewed and analyzed in light of the foregoing principles, these facts clearly demonstrate that the general conversation preceding the statement under challenge did not amount to proscribed police "questioning" or "interrogation," and as a consequence it did not taint or vitiate the ensuing statement. It also bears emphasis that defendant waived his *Miranda* rights only after he had been fully advised of those rights, and also that the waiver under attack was made by defendant voluntarily without promises and without being "threatened, tricked, or cajoled into a waiver" by the police (cf. *Miranda* v. *Arizona, supra,* 384 U.S. at p. 476 [16 L.Ed.2d at p. 725]). Under these circumstances, we cannot say that the ruling of the trial court admitting the statement in evidence (which is tantamount to a finding that defendant waived his *Miranda* rights freely and voluntarily) was not supported by the requisite quantum of evidence, much less that it was "palpably erroneous." It thus follows that we are not empowered to overturn the ruling of the court below (*People* v. *Turnage, supra,* 45 Cal.App.3d 201, 211; *People* v.

*Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675]; *People* v. *Robinson* (1969) 274 Cal.App.2d 514, 520 [79 Cal.Rptr. 213]).

Defendant nonetheless insists that the waiver here should be held invalid. In essence, defendant argues that his consent to give a statement to Officer Long was elicited by the police before he was fully advised of his *Miranda* rights by informing him that codefendant Smith had already made highly incriminating statements, and by indicating that if he gave a statement to Officer Long, he would not be further questioned by Detective Wallace. All this, goes on defendant, amounted to a " 'conversation-warning-interrogation' " sequence and a clever " 'softening-up' " both of which are condemned and proscribed by *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050]. Defendant's argument premised on *Honeycutt* cannot be accepted for a number of considerations.

One, as the court in *Honeycutt* concedes, the "conversation-warning-interrogation" sequence is not forbidden under *Miranda*. Indeed, *Miranda* requires only that the warning must precede any custodial interrogation designed to elicit incriminating statements, which was done in the present case.

Two, while the California Supreme Court disapproves the "conversation-warning-interrogation" process in achieving a waiver of *Miranda* rights, the premise extending the *Miranda* rule is apparently predicated on the concern that the process in question may result in self-incrimination. As the court put it in *Honeycutt*, "The self-incrimination sought by the police is *more likely* to occur if they first exact from an accused a decision to waive and then offer the accused an opportunity to rescind that decision after a *Miranda* warning, than if they afford an opportunity to make the decision in the first instance with full knowledge of the *Miranda* rights." (*People* v. *Honeycutt, supra,* 20 Cal.3d at p. 160, italics added.) This, of course, does not change the longstanding rule expressed in innumerable cases that the overriding consideration and the ultimate test of the validity of a waiver is whether it was made voluntarily and free from any coercion.[2] It follows that where, as here, the voluntariness of the waiver is abundantly supported by the circumstances of the case and the evidence of record, the waiver must be held effective and valid even if a minor fault occurred during the process leading to the waiver.

[2]The court in *Honeycutt* indeed articulates that "the purpose of *Miranda* is to preclude police interrogation unless and until a suspect has voluntarily waived his rights or has his attorney present." (P. 160.)

Three, it is clear that *Honeycutt* involves a unique factual situation and hence its holding must be read in the particular factual context in which it arose. Briefly stated, in *Honeycutt*, following his arrest, the defendant was transported to the police station. While en route, and without any *Miranda* admonition, Detective Williams "tried to talk to defendant who looked back silently at the officer." (*Id.,* at p. 158.) At one point during the trip, the defendant volunteered that Williams knew him under a different name. Williams then recognized the defendant as a person he had known through police contacts for about 10 years.

Upon arrival at the station, the defendant was taken to an interview room where he became "hostile to Detective Tague, calling him racist epithets and spitting at him." (*Id.,* at p. 158.) Tague, as a result of this reaction by the defendant, left the room and Williams remained. Williams then engaged the defendant in a half-hour unrecorded discussion. The discussion concerned "unrelated past events and former acquaintances and, finally, the victim." Concerning the victim, Williams told the defendant that "the victim had been a suspect in a homicide case and was thought to have homosexual tendencies." (*Id.,* at p. 158.) Williams testified that " 'It was my duty to continue the efforts to try to get him to talk. And I was successful in it.' " (*Id.,* at p. 158.) Williams testified that, during the course of the interview, he " 'could see that [defendant] was softening up.' " (*Id.,* at p. 158.) At the end of the half-hour interview, defendant indicated that he would talk about the homicide. A court reporter was then obtained; the defendant was advised for the first time of his rights per *Miranda,* a waiver secured, and a confession made by the defendant.

The holding in *Honeycutt* was tailored to the aforestated facts, the court concluding that "When the waiver results from *a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation,* the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary for the same reason that an incriminating statement made under police interrogation without a *Miranda* warning is deemed to be involuntary." (*People* v. *Honeycutt, supra,* 20 Cal.3d at pp. 160-161; italics added.)

The facts of the instant case are saliently different from those presented in *Honeycutt.* Officer Long was not a long-time acquaintance of defendant; defendant did not show an initial hostility toward the officer or demonstrate unwillingness to speak with him; the contact between them was relatively brief, as opposed to the half-hour " 'softening-up' " session in *Honeycutt*; and no "disparagement of the victim and ingratiating

conversation" took place in the case at bench. Lastly, and no less significantly, defendant was admonished twice during the initial conversation that he did not have to say anything to the officer. In sum, since the facts are clearly different here, the *Honeycutt* holding does not obtain in the case at bench.

Four, defendant's charge that the police information advising him that his accomplice had already confessed amounted to some kind of improper " 'softening-up,' " does not hold water either. ■ It is well established that the practice of confronting a suspect with the confession of an accomplice is entirely lawful and does not vitiate the voluntariness of a *Miranda* waiver (*People* v. *Felix* (1977) 72 Cal.App.3d 879, 885 [139 Cal.Rptr. 366]; *People* v. *Long* (1970) 6 Cal.App.3d 741, 748 [86 Cal.Rptr. 227]; *People* v. *Lantz* (1968) 265 Cal.App.2d 5, 8, fn. 4 [71 Cal.Rptr. 188]).

In disposing of defendant's last charge of a *Miranda* violation, we briefly note that the statement made to Officer Wallace was preceded by full *Miranda* warnings, and the record discloses that defendant understood those rights and voluntarily waived them. Defendant's contention that the statement to Officer Wallace was tainted by the illegality of the proceeding before Officer Long must fail for the plain reason that, as we have concluded before, the statement to Officer Long was properly obtained.

*Exclusion of Evidence*: Defendant next contends that the trial court erred in excluding Dr. Komisaruk's expert opinion on the issue of defendant's ability to form specific intent to commit robbery. Defendant's argument must be rejected for two major reasons.

In the first place, the record shows that defense counsel was allowed to put on a hypothetical question regarding the matter to which Dr. Komisaruk did in fact answer.[3]

In the second place, the record also reveals that during cross-examination the prosecutor asked the doctor whether defendant was conscious or unconscious as a result of PCP ingested on the night of the

---

[3]The pertinent part of the record reads as follows: "Q. All right. If we can assume the facts which were given to you concerning the background of an individual, assume that the individual is about six-foot, 26 years old, and has just ingested one-half of a joint, or approximately one and a half inches in terms of a cigarette of PCP; is that individual, then, able to form a specific mental state required for the commission of a robbery? A. I can't answer that question in absolute terms. *I think that it's entirely possible that the elements necessary for the formation of specific mental intent might be present as a result of the PCP inhalation.*" (Italics added.)

commission of the crimes. When so asked, Dr. Komisaruk explicitly stated that he could not give an answer to that ultimate question.[4] In light of this record, defendant's claim of error blatantly lacks any merit.

*Jury Instructions*: The trial court instructed the jury per CALJIC No. 4.20 that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.[5] ■ Defendant now claims that giving CALJIC No. 4.20 to the robbery charges at bench constituted reversible error. We cannot agree.

While it has been said that where, as in the instant case, the crimes charged require specific intent CALJIC No. 4.20 should not be given (*People* v. *Spencer* (1963) 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Ford* (1964) 60 Cal.2d 772, 796 [36 Cal.Rptr. 620, 388 P.2d 892]), the case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. As stated in *People* v. *Wingo* (1973) 34 Cal.App.3d 974, 979 [110 Cal.Rptr. 448], "Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other instructions and in the light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court." (See also *People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 21 [98 Cal.Rptr. 249]; *People* v. *Hunter* (1956) 146 Cal.App.2d 64, 67 [303 P.2d 356].)

When read as a whole, the instructions at bench clearly advised the jury that the crime of robbery required proof of specific intent, and also that in determining whether the defendant had the requisite specific intent, his intoxication at the time of the alleged offense was to be taken

[4]The illustrative portion of the record reads as follows: "Q. Doctor, based on what the defendant told you about how much PCP he had ingested on the night of October 21st, *you can't really tell us whether he was conscious or unconscious, can you*? A. *No, I cannot.* Q. *And you can't really tell us whether he was acting with the requisite intent to commit the crimes alleged, can you*? A. *No. I can't answer the ultimate question,* no." (Italics added.)

[5]The instruction given to the jury reads as follows: "Our law provides that 'no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition.' [¶] This provision of the law means that if the evidence shows that the defendant was voluntarily intoxicated when allegedly he committed the offenses charged, his intoxication is not a defense to such charge." (CALJIC No. 4.20.)

into account by the jury.[6] Since in the case at bench the cited additional instructions abundantly explained to the jury that the specific intent, an indispensable element of the robbery charges, can be negated by proof of diminished capacity, by no stretch of the imagination could the jury have been confused or misled by CALJIC No. 4.20. Under these circumstances, it cannot be said that the inclusion of CALJIC No. 4.20 constituted prejudicial error (cf. *People* v. *Conley* (1968) 268 Cal.App.2d 47 [73 Cal.Rptr. 673]; *People* v. *Asher* (1969) 273 Cal.App.2d 876 [78 Cal.Rptr. 885]).

*Multiple Punishment*: Defendant finally contends that imposition of sentence on count one (possession of a sawed-off rifle) violated the prohibition against multiple punishment. Defendant's position is not well taken.

Section 654 provides in pertinent part that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one. . . ." The cases interpreting this statute explain that section 654 does not interdict multiple prosecutions where a single act may constitute more than one crime. However, it does forbid the imposition of multiple punishment on criminal convictions growing out of a single act (*In re Ward* (1966) 64 Cal.2d 672, 676 [51 Cal.Rptr. 272, 414 P.2d 400]; *People* v. *Hicks* (1965) 63 Cal.2d 764, 765-766 [48 Cal.Rptr. 139, 408 P.2d 747]). The cases also underscore that section 654 applies not only where there was but one "act" but also where a "course of conduct" violates more than one statute. In the latter instance the issue to be determined is whether the course of conduct comprises a single or a divisible transaction. Whether a course of criminal conduct is divisible,

---

[6]The pertinent instructions given to the jury read as follows: "*In the crime of robbery of which the defendant is accused, a necessary element is the existence in the mind of the defendant of the specific intent* which I have defined.

"*If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent.*

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent, you must give the defendant the benefit of that doubt and find that he did not have such specific intent." (CALJIC No. 4.21; italics added.)

"*When a defendant is charged with a crime which requires that a certain specific intent* or mental state *be established in order to constitute the crime* or degree of crime, *you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition,* however caused, *which prevented him from forming the specific intent* or mental state *essential to constitute the crime* or degree of crime with which he is charged.

"If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state." (CALJIC No. 3.35; italics added.)

and therefore gives rise to more than one act within the meaning of the section, depends on the intent and objective of the actor. If all the offenses were incident to one objective, the defendant may be punished for any of such offenses but not for more than one (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]).

In accordance with the aforestated general principles, it has been held that a defendant may not be punished for possession of a weapon and for another offense in which the weapon was used where the evidence does not show possession for any other purpose (*People* v. *Jurado* (1972) 25 Cal.App.3d 1027, 1033 [102 Cal.Rptr. 498]). ■ In further elaborating on the question, the cases spell out that where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved (*People* v. *Hudgins* (1967) 252 Cal.App.2d 174, 184-185 [60 Cal.Rptr. 176]; *People* v. *Moore* (1956) 143 Cal.App.2d 333, 342 [299 P.2d 691]). On the other hand, where the evidence shows possession only in conjunction with the primary offense, the punishment for the illegal possession of the firearm has been held to be improper (*In re McWhinney* (1968) 267 Cal.App.2d 691, 695 [73 Cal.Rptr. 291]; *People* v. *Burnett* (1967) 251 Cal.App.2d 651, 658 [59 Cal.Rptr. 652]).

The evidence in the case at bench clearly shows that the possession of the sawed-off rifle by defendant was both antecedent and separate from the primary offense (i.e., the robberies charged in the case), and thus does not come within the purview of section 654. Codefendant Smith testified that defendant obtained the rifle a couple of months before the night of the robberies, and that Smith had seen it in defendant's possession prior to October 21, 1976.[7] But, even if we adopt defendant's version with

[7] The illustrative portion of Smith's testimony is cited as follows: "MS. PARRILLI: Q. Mr. Smith, showing you what has previously been marked as People's No. 5 for identification, I'll ask you to take a look at that. (Witness Examines Exhibit) Have you ever seen that weapon before? A. Yes. Q. Where did you see it—the first time? A.—had it the night of October 21st. Q. *When did you first see this weapon*? A. *Oh, couple of months before that night.* Q. Couple of months before that night? A. Uh-huh. Q. What was the condition of that weapon when you first saw it? A. The stock, the steel part was sawed off. Q. It was sawed off when you first saw it? A. Yeah, the whole thing—no, the other part was being sawed off when I seen it. Q. Okay. Who was doing the sawing? A. I don't know. Q. Where did that take place. A. Took place several different places. Q. Okay. Did you ever see that rifle in its—when it was in its—I don't know whether it was 'normal'—when it was in its factory issue condition, that is, when the barrel was in a longer state? A. Yes. Q. Did you see it when the stock was in a longer state? A. Yes. Q. *Between the time you first saw the weapon and the night of October 21st, did you ever see the weapon again*? A. *Sometimes, sitting around the house.* Q. *Okay. Did you ever see Mr. Patterson with the*

respect to the possession of the weapon, it is readily apparent that according to his own statement he took the gun from the bedroom of the people's home where he had been invited to a party without any intent to commit the robberies.[8] In brief, in his own admission defendant did not obtain and possess the rifle in question with the intent and objective to commit the primary offenses. As a consequence, the course of conduct here was clearly divisible, precluding the application of section 654.

The judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 22, 1979.

---

*weapon*? A. *He just left it sitting, didn't mess with it.* Q. When you say 'around the house,' whose house are you referring to? A. Pattersons'. Q. Okay. On the night of October 21st, when you went in the car with Mr. Patterson did you see the weapon at that time? A. Yes. Q. Did he take it out and show it to you? A. Yeah." (Italics added.)

[8]In his admission to Officer Long, which was introduced in evidence, defendant stated as follows: "*I took a gun out of this place from the bedroom.* I think it was a 22, and I could tell by the handle that it was rough. I didn't know if it would shoot or not. *I wasn't planning to shoot it.* I didn't check to see if it was loaded. . . . I wasn't thinking anything about a robbery. It just all of a sudden, bam, jumped in my head. I don't know how it got in my head. *I didn't take off from the house to go commit a robbery.*" (Italics added.)